**UNITED STATES of America**

v.

**Philmore WILLIAMS, Defendant.**

No. 78 CR 272.

United States District Court,
E. D. New York.

Jan. 3, 1980.

**454**

Federal Defender Services Unit, Legal Aid Society by Marion Seltzer, Brooklyn, N. Y., for plaintiff, Philmore Williams.

Edward R. Korman, U. S. Atty., E. D. N. Y. by Judith Pierce, Asst. U. S. Atty., Brooklyn, N. Y., for defendant, United States.

## MEMORANDUM OF DECISION AND ORDER

COSTANTINO, District Judge.

Defendant, Philmore Williams, is charged with forcibly assaulting an employee of the United States Postal Service in violation of 18 U.S.C. § 111. The Government alleges that on May 1, 1978 defendant did assault, with the use of a deadly and dangerous weapon, one Constantine Tricoukes, while Mr. Tricoukes was engaged in the performance of his official duties. Defendant contends that he is not guilty of assaulting a Federal employee because he was legally insane at the time of the commission of the crime.

A nonjury trial was held before the Honorable Mark A. Costantino on June 18, 20 and 21 of 1979. The psychiatric evidence proffered during trial included three psychiatrists. Doctors Abrahamson and Klaf testified on behalf of the Government and Doctor Stone testified for the defendant. After listening to the testimony of Doctor Abrahamson the court determined that it could not accept his diagnosis of defendant's general state of mind, namely, neurotic depression with symptoms of hypocondriasus. Doctor Abrahamson attempted to question the validity of twenty-six years of medical opinion which described defendant Williams as being some form of schizophrenic. The court, after examining the voluminous hospital records, could not accept Doctor Abrahamson's disagreement with defendant's long psychiatric history. Thus, the court, in reaching its decision concerning the sanity of defendant, relied upon Doctors Klaf and Stone and the hospital records presented to the court.

On the basis of the testimony given during the trial and the record before the court, the court finds that the Government has proved beyond a reasonable doubt that Philmore Williams was sane at the moment he shot postman Tricoukes and further, that the Government has proven beyond a reasonable doubt that defendant is guilty of violating Section 111 of Title 18 of the United States Code.

### FINDINGS OF FACT

Mr. Constantine Tricoukes, as station manager of the Springfield Gardens Post Office, first met defendant Williams on January 3, 1978. At that time, Mr. Williams was "yelling and causing a commotion" in the post office because his veteran's check had not been delivered. Mr. Tricoukes then handed the check to Mr. Williams and advised defendant as to the reason for the delay.

On May 1, 1978 at 8:30 a. m., defendant Williams, who again was annoyed because he was not receiving his veteran's check, returned to the Queens Post Office and spoke with Mr. Tricoukes. Mr. Tricoukes,

could not locate defendant's check and suggested that he return to the post office the following day. At 1:00 p. m. that same afternoon defendant reappeared, began causing a commotion and in a loud tone of voice asked to speak with the station supervisor.

Mr. Tricoukes was summoned. The two exchanged words. Defendant was emphatic about not receiving his mail. Mr. Tricoukes repeated that he had explained everything about defendant's mail earlier that day. Defendant responded by shouting, "I guess that's it". Defendant then drew his revolver, pointed it at Tricoukes, and fired. Tricoukes was hit in the right shoulder.

Mr. Williams placed the revolver back in his waistband and began to exit the post office. Mr. James Lewis, an officer employed by the New York City Housing and Police Department, was present in the post office at the time of the shooting. As the defendant stepped outside, Officer Lewis flashed his badge, shouted "Police" and instructed defendant not to move. Williams looked at Lewis and then defendant raised his right hand so as to reach inside his belt, whereupon Lewis stated, "Please don't Mister, I will have to shoot you." Defendant Williams then raised his hands and was placed under arrest.

At the Queens precinct Inspector Sidney Wilson, an employee of the United States Postal Service, spoke with defendant Williams. After Williams admitted to the shooting, Inspector Wilson asked defendant why he had shot Manager Tricoukes. Defendant stated that Tricoukes had failed to keep his promise, that the manager was supposed to hold defendant's mail but had not done so. He related to Inspector Wilson that after leaving the post office on the morning of May 1, 1978, he had returned to his home and had waited for the arrival of the mail. Upon learning that the mail carrier had no knowledge of defendant's check, Williams picked up his revolver, placed it in his waistband and drove back to the post office where he demanded to see Manager Tricoukes.

Inspector Wilson then accompanied defendant Williams to the Postal Inspector's Office in Brooklyn where defendant signed a Warning and Waiver of Rights Form after being advised of his constitutional rights. Defendant then signed a detailed confession of the events leading up to and including the shooting of Manager Tricoukes. Inspector Wilson further testified that defendant had acknowledged that he could have killed Tricoukes, but that Tricoukes should have kept his promise. Finally, defendant explained in his confession that he took his gun to the post office, on the afternoon of May 1, 1978, because he thought that the supervisor was going to make him "warm, mad."

In court, defense counsel did not dispute the fact that Williams had shot manager Tricoukes on May 1, 1978. The question presented to the court involved the mental state of the defendant, to wit, whether because of some mental disease defendant lacked the requisite intent required by law such that he was not responsible for his criminal conduct. Defendant sought to prove that he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. In his defense, defendant presented the testimony of one Doctor Stone and submitted to the court documentation pertaining to his medical history.

Doctor Stone, who examined Williams on April 30, 1979, diagnosed defendant as a simple schizophrenic, the class of schizophrenics which includes individuals who have problems with day to day activities and who appear quiet and withdrawn. The Doctor noted that defendant's disease had been largely in remission because of medication. During the examination, however, defendant advised Doctor Stone that his supply of medication had been depleted three days before the assault. Doctor Stone testified that this fact was significant insofar as failure to take the medication could cause defendant to become irritable and develop looseness of associations and paranoid thoughts.

Doctor Stone also related that defendant's description of the sequence of events on May 1, 1978 demonstrated that his thoughts, at the time he pulled the trigger, were disorganized and further, that defendant was not at all clear about what had transpired on that particular afternoon. On the basis of Williams' assertions during the examination, Doctor Stone concluded that defendant's thought process had been disorganized. Specifically, when Tricoukes could not locate the check, defendant explained that he returned to his car and found the gun but it neither was clear to defendant why the gun was in the car nor did he remember shooting the postman. He further supported this diagnosis by the fact that defendant did not attempt to escape after the incident.

Defendant presented a long history of mental disease dating back to 1953. Over a twenty-six year period doctors had described defendant's insight and judgment as impaired and his emotional reaction as inappropriate. In 1975 Doctor Ernest Oppenheimer began to periodically examine defendant Williams. During that year, Doctor Oppenheimer diagnosed defendant as a "schizophrenic in full remission." In September of 1977 Doctor Oppenheimer began to prescribe thorazine because defendant was having problems sleeping. On January 27, 1978 the Doctor rediagnosed defendant as in an "active schizophrenic process." Doctor Oppenheimer, however, did not request that Williams be hospitalized.

Both Doctors Stone and Klaf testified that the thorazine was able to stabilize defendant's condition. Doctor Stone stated, however, that if defendant had not been taking his medication several days before the incident, this fact could have led to looseness of association, where one thought wouldn't lead to a rational response. Doctor Stone characterized defendant's acts as bizarre and such acts indicated that defendant "probably" had experienced looseness of thought. Doctor Stone cited several factors as central to his conclusion, namely, defendant didn't recall shooting the postman, didn't know why the gun was in the car, and had no coherent recollection of the exact sequence of events which had transpired on May 1, 1978. Finally, Doctor Stone felt that the confession was of limited utility in diagnosing defendant. He found first, that the confession did not indicate defendant's actual thoughts, and second, that the confession was based upon what other people had told defendant about the shooting.

In stark contrast to Doctor Stone's testimony, Doctor Klaf reported that defendant Williams had not suffered from auditory hallucinations at the time of the shooting. Indeed, Doctor Klaf concluded that defendant had a good comprehension of where he was, how he got there, and what weapon he had used, and further, that defendant exhibited a good recollection of the events of May 1, 1978. On May 26, 1978, a few weeks after the incident, defendant admitted to Doctor Klaf that the postman had made him angry. Williams stated to Doctor Klaf that he had not felt that anyone was trying to harm him and he had not heard voices before the commission of the assault. Indeed, both Doctors Stone and Klaf stated that there was no evidence of delusions, paranoid ideas or hallucinations which came to light during the medical interviews.

Doctor Klaf concluded that Williams had responded to a frustrating situation. He had been promised a check, had become "upset about certain regulations in the Post Office" and needed the check to pay various bills. When Williams was told that the check would not be forthcoming he became enraged. Doctor Klaf then explained that when people are angry they do things that they would not ordinarily do. Even Doctor Stone acknowledged that anger is the basis of a number of violent crimes.

During the medical interview of May 26, 1978, Williams made no mention of the alleged depleted supply of thorazine. However, in a second interview with Doctor Klaf on June 22, 1978 defendant raised this point. The Doctor stated that one's symptoms could remain in remission notwithstanding the fact that such drug usage had been curtailed or stopped. It also was noted that defendant had been given a new

prescription on April 18, 1979, less than a month before the shooting. Most significantly, the April 18, 1978 clinic record of defendant Williams, which included an examination made thirteen days before the shooting, indicated that defendant was in "stable condition."

Doctor Klaf testified that his medical examination of the defendant showed that defendant had been angered and annoyed at the postman on May 1, 1978. Thus, in the defendant's mind, there was a reason to harm the man who would not produce his check. The Doctor concluded that when the shot was fired, the defendant intended to use the gun and realized what he was doing.

The court finds Doctor Klaf's analysis and conclusion that defendant was sane at the moment he shot Tricoukes to be most persuasive. Doctor Stone's diagnosis that defendant lacked substantial capacity to appreciate the wrongfulness of his act or to conform his conduct to the law on the basis that defendant neither knew why the gun had been in the car nor recalled pulling the trigger is not convincing. Both Doctors testified that, during the course of the medical interview, defendant acknowledged that he knew he had shot a postal employee. Notwithstanding this admission, Doctor Stone stated that defendant "probably" had experienced looseness of thought at the time of the shooting in view of the fact that defendant related the events of May 1, 1978 in a disorganized fashion. Yet defendant was not so disorganized that he did not know where to go to complain about his check.

Further, defendant did not shoot just anyone "but waited until Tricoukes was summoned." Williams previously had dealt with the station manager when his check had not been forthcoming. Thus, according to medical testimony, the shooting of the postman was not an inappropriate response once Tricoukes would not deliver the check. As proven by oral and written confessions and medical examinations, defendant was angered at and annoyed by the station manager. Williams had indicated to Doctor Klaf that he had been in need of money on May 1, 1978 to pay bills and to accompany a friend to the race track. Doctor Klaf testified that he had been promised a check but that it could not be located in the post office. "When he was told it wasn't there, he became enraged. He indicated that he was angered and annoyed. To him it was appropriate to shoot the postman."

Most significantly, both doctors testified that when people are angry they do things that they wouldn't ordinarily do. Doctor Stone acknowledged that anger was the basis of a number of violent crimes. Thus this assault was not the act of impulsive destructiveness. As indicated in defendant's confession and medical examination, Williams brought the gun to the post office because he felt that the postman was going to make him angry. Doctor Stone admitted that if Williams had intended to use the gun on May 1, 1978, the act could not be considered irrational under the circumstances. Examining the facts as presented, it becomes clear that there was a reason for taking the gun and using it. Specifically, the assault was a response to the fact that the postman had made Williams "warm, mad." The fact that defendant returned to his home to get the gun and then waited to see Mr. Tricoukes indicate that when the shot was fired the defendant intended to use the gun.

The court does not find persuasive defendant's claim that he had not been taking his medication and therefore experienced a "flare-up" in his condition. Doctor Klaf testified that even if defendant had not ingested the proper amount of medication, it would not alter his diagnosis. In fact, on May 26, 1978, days after the assault, defendant had made no mention to Doctor Klaf of the problem involving his medication.

Further, after reviewing all the testimony and medical records the court does not find the existence of a "flare-up" in defendant's psychological condition to have occurred on May 1, 1978. Despite the fact that Doctor Oppenheimer, on January 27, 1978 had indicated that Williams distorted

reality and exhibited active schizophrenic process, a subsequent psychiatric examination on April 18, 1978 found defendant to be cooperative and stable.

Doctor Stone placed much emphasis on the fact that defendant had no recollection of the events or his thoughts on May 1, 1978. Defendant's confession, however, represents a clear recitation of the events leading up to the shooting and proffers personal reasons why he had shot Tricoukes. Williams' account of the incident exactly paralleled the events as they actually happened.

According to Doctor Stone, Williams remembered only what was told to him. Yet there is no evidence to suggest that the confession was anything but the product of Williams' own mind. Indeed, Officer Lewis testified that he had said nothing about the shooting. Inspector Wilson testified that he asked Williams if he would recount what happened. The following dialogue ensued:

And Williams said, "I shot him." I said why did you shoot him. He said because he didn't keep his promise. I said what promise. He said, well, he had promised to hold my mail and he did not keep his promise. He said he told the supervisor that he had made arrangements for his mail to go down to the South but now that he is back from the South he did not want his mail sent down South. He said the supervisor wrote some information down on a piece of paper and also told him he should come back one day before the first of May. He said on May first, the morning of May first, he went to the post office and he had a conversation with the station manager who was the supervisor who had told him to come one day prior to the first to talk about his mail. He said he asked the supervisor if he had his mail and the supervisor told him I have no mail. The supervisor also told him if you want you can ask the carrier. So Williams said he left the post office and he drove home and waited for the carrier to arrive at his home. When the carrier got to his house he asked the carrier if he had any mail for him and the

carrier told him no. So, Williams said he went back into the house, picked up the revolver that he had and placed it in his waistband and drove . . . back to the post office where he asked to see the supervisor. So when the supervisor came out he again asked him if he had any mail for him and the supervisor said, no, I don't have any mail, maybe it will come later. So, he said, with that he removed the gun from his waistband and shot the supervisor.

Defendant's medical interview with Doctor Klaf and the testimony of Tricoukes corroborate the remarks made to Inspector Wilson. For Williams, who was angry at the postman for not keeping his promise, the assault, under the particular circumstances, represented a rational response to an annoying situation.

## CONCLUSIONS OF LAW

Defendant, Philmore Williams, on May 1, 1978 shot and injured Constantine Tricoukes, a federal postal employee. Defendant contends, however, that he is not guilty of assaulting a federal employee because he was legally insane at the moment of the commission of the crime. It is defendant's position that the Government has failed to prove beyond a reasonable doubt that he was sane at the time of the shooting.

 A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. *United States v. Freeman*, 357 F.2d 606 (2d Cir. 1965); *See also United States v. Bell*, 500 F.2d 1287 (2d Cir. 1974); *United States v. Bohle*, 475 F.2d 872 (2d Cir. 1973). The sanity of a defendant at the time of the commission of the offense must be established by the government beyond a reasonable doubt once the defendant raises the issue of mental capacity. *United States v. Porter*, 431 F.2d 7 (9th Cir.), *cert. denied*, 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970); *United States v. Chandler*, 393 F.2d 920 (4th Cir. 1968); *United States v. Shapiro*, 383 F.2d 680 (7th Cir.

1967). On the one hand, the defendant need not be totally incapacitated, on the other hand, "any" incapacity is not sufficient to justify avoidance of criminal responsibility. *United States v. Freeman*, 357 F.2d 606 (2d Cir. 1966).

Medical testimony and hospital records presented to the court by defense counsel indicate that Philmore Williams is a disturbed man. Through the testimony of Doctor Stone, defendant's medical expert, the court was advised that Williams suffered from schizophrenia, a form of psychosis in which there is a disturbance in the area of thought and mood. Doctor Stone testified that during his interview with defendant Williams, the defendant related the events of May 1, 1978 in a disorganized fashion which led him to believe that defendant had experienced looseness of association during the time of the shooting. The Doctor concluded that defendant's thoughts concerning the sequence of events leading up to the assault were not at all clear and further, that his responses to the occurrences of May 1, 1978 showed a lack of emotion and thought. Yet, Doctor Stone conceded that Williams' post arrest statement which explicitly stated that defendant had been angry at the supervisor because he had not received his check, indicated both emotion and thought.

The Government conceded that defendant is a disturbed individual. Many years of hospital records documented this finding. However, the issue before the court is not whether Williams has suffered psychiatric problems, but whether at the time of the assault, as a result of a mental disease defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. Under the facts and circumstances before the court, the court finds that defendant was able to appreciate the wrongfulness of his conduct and to control his actions.

Specifically, there was the testimony of Doctor Klaf who described the actions of defendant as "appropriate" in light of the fact that defendant was annoyed at the postman for not locating his check. Indeed, defendant himself wrote that Tricoukes should have kept his promise to produce the check. Significantly, defendant admitted that he had taken the gun from his home because he felt that the supervisor was going to make him warm, angry. Doctor Klaf explained that many people who are angry do things that they would not ordinarily do. Doctor Stone concurred that anger is the basis of many violent crimes.

From the testimony presented during the trial, the court concludes that defendant was not suffering from auditory hallucinations at the time of the crime, did not experience delusional thinking, had a good comprehension of where he was on May 1, 1978, how he got there, and appreciated the fact that he was taking a weapon to the post office. The court finds that defendant had a good recollection of the events which transpired on May 1, 1978, notwithstanding the fact that he did not recall pulling the trigger.

It became evident from the testimony elicited during the trial that defendant could appreciate the wrongfulness of his conduct. Inspector Wilson testified that defendant had stated that he would have gone home and waited for the police had he not been arrested at the post office. Officer Lewis testified that after the shooting he told defendant, "Don't move, don't move, police." At that moment, defendant reached inside his belt supposedly to get a gun. However, after Officer Lewis' admonition, "Please don't Mister, I will have to shoot you", Williams responded rationally and raised his hands and submitted to arrest.

Further, the medical record on April 18, 1978, compiled several days before the assault, indicates that Williams was considered stable and cooperative. The evidence amply indicates that Williams was not experiencing any of the symptoms of acute schizophrenia at the time of the shooting and did not lack substantial capacity to either appreciate the wrongfulness of his conduct or to conform his conduct to the law. For example, when Doctor Klaf asked

defendant whether anyone was trying to harm him on May 1, 1978 Williams responded "No" and stated that he was upset because he did not get his check. Further, the assault cannot be characterized as an act of impulsive destructiveness since Williams had gone home to get his gun before returning to the post office. In fact, Williams was enraged at the postman for not locating his sorely needed veteran's check. It was thus "appropriate" for Williams to strike out. The court therefore must conclude that while Williams has psychological problems, the evidence indicates that he was able to appreciate the wrongfulness of his conduct and to control his actions.

*The Offense Charged*

■ The Government has proven beyond a reasonable doubt that defendant, Philmore Williams is guilty of violating Title 18 of the United States Code, Section 111 in that he did knowingly and willfully, forcibly assault with the use of a deadly and dangerous weapon, Constantine Tricoukes, an employee of the United States Postal Service, while this employee was engaged in the performance of his official duties.

■ Three essential elements have been proven beyond a reasonable doubt by the Government so as to establish the offense charged in the indictment. First, that the defendant forcibly assaulted an employee of the United States Postal Service, while such employee was engaged in the performance of his official duties. Any willful attempt or threat to inflict injury upon the person of another, when coupled with an apparent present ability to do so, and any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm, constitutes an assault. Here, it is beyond cavil that defendant took his gun from his waistband, pointed it at postman Tricoukes, and fired it while the postman was engaged in the performance of his official duties. Both Tricoukes and an eyewitness to the shooting, Officer James Lewis, testified that defendant Williams aimed his revolver at Tricoukes and shot him.

Second, that the Government has proven beyond a reasonable doubt that defendant used a deadly and dangerous weapon, namely, a .22 caliber revolver, in the commission of the crime. The revolver, which had been confiscated by Officer Lewis, was identified as the revolver belonging to defendant Williams and thereafter, was admitted into evidence.

■ Third, that the Government has proven beyond a reasonable doubt that defendant did act willfully. An act is done willfully if done voluntarily, with bad purpose either to disobey or disregard the law. *United States v. A. & P. Trucking Co.*, 358 U.S. 121, 79 S.Ct. 203, 3 L.Ed.2d 165 (1958). The court finds that defendant acted deliberately and intentionally, not accidentally, and acted with the object of causing the forbidden result. Here defendant left the post office, went home to get his gun and returned to the post office. Defendant brought the gun because he felt that the postman would make him angry. Upon entering the post office he asked to speak to Manager Tricoukes. Defendant demanded his mail and when Tricoukes would not produce the check Williams announced, "I guess that's it." Moments later, defendant drew his revolver and shot the manager. The acts and verbal statements of the defendant made before and after the shooting indicate beyond a reasonable doubt that the assault committed on May 1, 1978 was done willfully and intentionally.

*Concluding Remarks on the Standard of Insanity*

The numerous intentional and rational acts of defendant Philmore Williams bespeaks an individual who could appreciate the nature and consequences of his conduct at the moment of the commission of his crime. Yet defendant's general mental state, as evidenced by twenty-six years of psychiatric attention, provides the outline of a man with diminished mental capacity. Herein lies the legal conundrum, namely, by what standard do we judge the actions of those with diminished capacity? An answer to that question would bring the legal definition of insanity into focus with the truths of mental life.

The uncertainty wrought in identifying the criminally responsible defendant is reflected in the evolving standards of criminal insanity. At one point the courts required proof that, at the time of the commission of the act, the defendant was laboring under such a defect of reason from a disease of the mind, as not to know the nature of his act; or, if he did know it, that he did not know that what he was doing was wrong. It became clear, however, that the M'Naghten rule overlooked medical and psychological knowledge, disregarded the importance of unconscious motivation and relieved from punishment only those individuals who had no cognitive knowledge. Modern psychiatry, however, has taught us that there are degrees of incapacity, that an individual is a mentally complex being with varying degrees of awareness.

The legal profession thus felt constrained to develop a standard of criminal responsibility which was more attuned to modern psychiatric thinking about the capacity of an individual to appreciate the wrongfulness of an act. In 1954 the District of Columbia promoted the rule that an accused is not responsible if his unlawful act was the product of a mental disease or defect. The defense of insanity no longer required the total absence of cognitive knowledge. Most recently, the American Law Institute indicated that a person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect he lacks *substantial* capacity to *appreciate* the wrongfulness of his conduct or to conform his conduct to the requirements of law.

In rejecting the M'Naghten rule, the courts ended an all or nothing approach to insanity. Yet subsequent legal tests of insanity focused upon mental capacity at the moment of the crime and tended to ignore the implications presented by historical medical findings which indicated a degree of mental impairment existing both before and after the commission of the offensive act. Essentially, in locating criminal culpability it seems axiomatic that one must investigate the general condition of the mind at various time frames to discern whether there is diminished mental capacity.

A successful insanity defense does not weigh the varying degrees of mental disability. It is not sensitive to the recurring nature of an acknowledged impairment of the mind. Instead, the defense looks at the medical records of the defendant, but only in light of one point in time, namely, the exact moment of the crime. It is submitted that while a long period of mental treatment may not necessarily indicate legal insanity, it may indicate diminished mental capacity and the need for psychological assistance and medical commitment. Likewise, an individual may have the capacity to conform his conduct to the requirements of the law, but a history of mental problems may indicate the practical incapacity to take into account the relevance of the law in formulating intentions and assessing conduct.

It is well established that those adjudged insane do not stand trial because of the absence of criminal guilt. It is not a justification for excusing a harmdoer, but it is an acceptance that those who are legally insane demonstrate diminished culpability and require medical treatment. Treatment is proffered because of the belief that medical assistance can transform the defendant's penchant for irrational behavior into rational conduct. Yet a defendant with mental impairment or diminished capacity who is deemed to be legally sane at the moment of the crime is generally foreclosed from such medical commitment, even though the defendant's mental history bespeaks a need for treatment. In a humanistic society, however, such needs can not be ignored.

A black and white approach to a defense of insanity neglects the class of defendants who are temporarily impaired, who have a history of psychiatric problems but who could appreciate the wrongfulness of their conduct at the exact moment of the crime. The type and length of prison confinement for such defendants may have no relationship to their psychiatric needs. If our aim is to protect the welfare of society, we

should be more sensitive in locating the criminally responsible defendant. There should not be a rigid dichotomy between sanity and insanity, but an inquiry into the degree of diminished capacity of a particular defendant in light of all of the relevant medical history so that proper medical treatment can be provided.

■ Further, in determining the degree of criminal responsibility which should attach to the wrongdoer, it is relevant to question whether the mental disability still exists or is likely to recur. Individualized treatment should be given in certain cases so that the defendant can learn to control his conduct and to take into account the relevance of the law in formulating his intentions. In this way, society is protected as long as the precise limits which must be placed on the defendant are defined.

■ The difficulty lies in pinpointing the exact boundary between mental soundness and mental disorder, criminal responsibility and criminal incapacity. As psychiatry becomes more precise, the legal standard of criminal responsibility should take notice of less extreme deviations from the norm. Specifically, the alleged defect must be examined in light of the totality of the defendant's personality and medical background in order to determine whether the mind was so impaired as to interfere with the ability of the accused to rationally control his conduct or to grasp the relevance of the law to his conduct. The inquiry thus envisions the possibility of a mental disorder which would negate criminal responsibility even where the defendant knew the nature of the act and had the capacity to conform his behavior to the law. Most significantly, the law must become aware that an individual may be legally sane at the moment of the commission of the crime and yet possess such diminished mental capacity as to necessitate medical commitment.

The difficulty, however, in adopting any standard of criminal responsibility is that between the extreme cases of the raving lunatic and the man of perfectly sound understanding is every degree of mental capacity. Those who are mentally impaired are not easily discerned; they are not limited to the eccentric madman. Thus, the consequent struggle exists to identify the true capacity of the individual.

The facts, however, as presented to the court, indicate that defendant possessed substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law at the moment of the commission of the crime. Thus, in light of the court's findings of fact and conclusions of law, after a thorough examination of the hospital records and testimony elicited during trial, the court finds defendant Philmore Williams guilty of violating Title 18, Section 111, of the United States Code.

So ordered.