STATE

v.

Michael R. CORRERA.

No. 79–154–C.A.

Supreme Court of Rhode Island.

June 12, 1981.

Dennis J. Roberts, II, Atty. Gen., Kathryn A. Panciera, Sp. Asst. Atty. Gen., for plaintiff.

John F. Cicilline, Providence, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, Michael R. Correra (Correra), stands convicted after a Superior Court jury trial of (1) having committed murder in the second degree, (2) having committed a crime of violence while armed with a firearm, and (3) having received stolen goods. Following the denial of his motion for a new trial, Correra received a thirty-five-year sentence on the murder charge and concurrent two-year sentences on each of the other offenses.

The evidence adduced at trial indicated that during January 1977 Mary Henderson was living with Correra in an apartment located in North Providence. Mary testified that she had told her brother, Jack, about Correra's having physically assaulted her several times prior to the incident in question. Jack, who lived in Pawtucket, arrived at the apartment on January 12, 1977, at approximately 11:30 p. m. The purpose of his visit was to check on his sister's welfare.

Jack and Correra proceeded to do a bit of drinking and talking. The drinking involved straight shots of Scotch. The imbibing and conversation terminated at about 4:30 a. m. on January 13, 1977. Jack retired to a spare bedroom to sleep, and Correra went to his bedroom.

A few minutes later, Correra left his bedroom, claiming that he was seeing "little animals coming through the walls and they were trying to get him." Mary tried to calm him down, and in response to her urgings Correra called some of his friends and invited them to come over to the apartment. According to Mary, Correra then told her that he had heard something in the kitchen. He took a gun from a night stand next to the bed and pointed it at Mary. When Correra asked her who was in the other bedroom, she replied, "Jackie." Correra then yelled, "I don't want him in my house. Wake him up." Correra then went into the adjoining bedroom. He first pointed the gun at Jack's head and then at his shoulder, and pulled the trigger. After a short struggle with Correra, Mary ran out of the house to seek help. Correra told her, "Go ahead. Go call the cops."

When the police arrived, Correra was nowhere to be found. Later, it was determined that he had run in his stocking feet some two miles to a friend's house. A .357–caliber magnum pistol was found in a standing ashtray in the hallway opposite Correra's apartment. This gun was loaded with one round spent. A ballistics expert

testified that a test firing indicated that the magnum was the murder weapon. Additional bullets were found in a night stand in Correra's bedroom. Subsequent investigation determined that the magnum had been stolen sometime between August and November of 1976.

At trial, Correra's defense was based upon the theory of diminished capacity. Correra's friends and family all testified that he had been ill for two weeks prior to the shooting and at various times had been hallucinating.

Doctor Bruno Franek, a psychiatrist, told the jury that Correra's hallucinations resulted from a disease that was referred to at the trial as herpes simplex encephalitis. Herpes simplex is a virus that can cause infections just about anywhere in the body; and in this case, according to Dr. Franek, the virus caused inflammation, swelling, and eventual degeneration of a portion of Correra's brain tissue. This witness told the jury that Correra's encephalitis was the transitory type and that it would come and go. He also reported that because of that condition, on the night in question Correra was incapable of possessing the necessary specific intent to kill.

Doctor Robert E. Becker, medical director of the Institute of Mental Health, reached a different conclusion. He said that Dr. Franek's diagnosis was based on inadequate information. Doctor Becker was of the opinion that additional tests and consultations were an absolute requirement before anyone could give an opinion about Correra's mental state. Unlike Dr. Franek, Dr. Becker believed that Correra's ingestion of alcohol and drugs was a matter of considerable import. Doctor Becker was unable to reach any conclusions concerning Correra's mental status.

The third expert was Dr. George Peter, director of the Division of Infectious Diseases at Rhode Island Hospital. He testified that only one in fifty cases of encephalitis was caused by herpes simplex and that recent studies indicated that the mortality rate for those afflicted with this disease was 70 percent. Those who survived, he said, suffered residual neurological complications such as paralysis or seizures. Doctor Peter was also insistent that the particular blood tests ordered by Dr. Franek for that condition were meaningless and that no one with the symptoms Correra allegedly showed could have been suffering from herpes simplex encephalitis.

In the appeal, Correra raises several issues. Some relate to the diminished-capacity doctrine, and some relate to certain evidentiary rulings made by the trial justice. We shall first direct our attention to the diminished-capacity issue.

■ The diminished-capacity doctrine recognizes that although an accused was not suffering from a mental disease or defect when the offense was committed sufficient to exonerate him of all criminal responsibility, his mental capacity may have been diminished by intoxication, trauma, or mental disease so that he did not possess the specific mental state or intent essential to the particular offense charged. A defendant claiming diminished capacity concedes his responsibility for the act but claims that, in light of his abnormal mental condition, he is less culpable. Recently in *State v. Doyon*, R.I., 416 A.2d 130 (1980), we refused to apply the diminished-capacity doctrine to an offense that might be classified as a "general-intent crime."

Correra's reliance on diminished capacity reminds us that in *State v. Fenik*, 45 R.I. 309, 315, 121 A. 218 (1923), the court did allow evidence of the defendant's abnormality to determine his "fixity and duration of the conscious intent or premeditation." At the time *Fenik* was decided, the M'Naughten defense of insanity was in existence. Our adoption of the American Law Institute view of criminal responsibility in *State v. Johnson*, R.I., 399 A.2d 469 (1979), established a test that encompasses mental abnormalities which at the time of *Fenik* would not be sufficient to relieve a defendant of criminal responsibility. Accordingly, we shall reexamine the issue discussed in *Fenik* in light of what we said in *State v. Johnson*.

About a quarter of a century ago the United States Supreme Court in *Fisher v. United States*, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946), refused to take a position on the issue of diminished capacity and said such a question might well be considered by the individual Federal Circuit Courts of Appeals. However, Justices Frankfurter, Murphy, and Rutledge filed vigorous dissents in which they urged that this doctrine be recognized. The logic of their position has received widespread approval. Today, a majority [1] of the jurisdictions that have considered the diminished-capacity concept have ruled that whenever the state has the obligation to establish a conscious mental ingredient as one of the elements of the crime charged, the defendant is free to establish the existence of a mental defect or obstacle to the presence of the state of mind that is an element of the crime, such as, premeditation or deliberation. Some jurisdictions, in taking an all-or-nothing position, have declared that there is no intermediate stage of partial criminal responsibility for an individual; either he is totally responsible or an acquittal is in order.

■ In recognizing the concept of diminished capacity, we are persuaded by the following conclusion expressed by Judge Leventhal in *United States v. Brawner*, 471 F.2d 969, 999 (D.C.Cir.1972):

"Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility."

However, we hasten to add that our decision is subject to the comment expressed earlier in the *Johnson* case where, in adopting the A.L.I. standards for determining criminal responsibility, we said:

"The terms mental disease or defect do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *State v. Johnson*, R.I., 399 A.2d 469, 476 (1979).

Our opting for this defense in the so-called specific-intent cases is a recognition of the great advancements made in the psychiatric field. *Hughes v. Mathews*, 576 F.2d 1250 (7th Cir. 1978); *United States v. Williams*, 483 F.Supp. 453 (E.D.N.Y.1980); *State v. Gramenz*, 256 Iowa 134, 126 N.W.2d 285 (1964); *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976).

Judicial reliance upon psychiatric testimony in other areas of the law belies any concern that such evidence is not a sufficiently recognized and acceptable medical science capable of offering quality expert guidance. Whatever judicial skepticism may exist regarding psychiatric science is best resolved through the factfinder's determining the credibility and weight to be given the expert's testimony instead of resolving the uncertainty by a total exclusion. Rejection of the diminished-capacity defense because of a fear of the unreliability of psychiatric testimony implies a distrust of the jury, which in actuality is free to believe or disbelieve the testimony given on this issue. *State v. Holden*, 85 N.M. 397, 512 P.2d 970 (1973).

It should also be noted at this juncture that a successful defense of diminished capacity does not free a defendant but instead results in the conviction of a lesser included offense. The sentences for these lesser offenses have been found to be long enough to keep the defendant in custody for a significant period. LaFave & Scott, *Criminal Law* § 42 at 331–32 (1972).

The trial justice recognized the diminished-capacity rationale in his charge to the jury, and this charge represents another area of Correra's appeal. Correra claims that in the charge the trial justice erred because he placed the burden of proof upon

1. See Appendix.

Correra to establish the defense of diminished capacity. In making this argument, he directs our attention to *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); and *State v. Baker,* R.I., 417 A.2d 906 (1980). We disagree.

In his charge, the trial justice reminded the jury that before it could return a murder verdict, it must be satisfied that the shooting was both malicious and premeditated. He also told the jurors that they must take into consideration all the evidence indicating that Correra at the time of the crime was suffering from some abnormal mental condition that prevented him from forming the specific intent essential to constitute the crime of murder either in the first or second degree and also that "if you find that the defendant's mental capacity was such that you have a reasonable doubt whether he did premeditate, deliberate or form an intent to kill, you cannot find him guilty of murder in the first degree or second degree." The trial justice expressed similar sentiments about whether the jury believed Correra had acted with malice aforethought. The trial justice concluded this portion of the charge by commenting, "If the jury is not satisfied that the State has proved the specific intent and premeditation necessary for murder, either in the first degree or second degree, you may consider whether or not the State has proved manslaughter."

Since the purpose of the diminished-capacity doctrine is to establish the absence of an essential element of the crime, the state still has the burden of overcoming this effort by proof of all the essential elements beyond a reasonable doubt. *State v. Santiago,* 55 Haw. 162, 165–66, 516 P.2d 1256, 1258–59 (1973); *State v. Gramenz,* 256 Iowa 134, 144, 126 N.W.2d 285, 291 (1964); *State v. Umscheid,* 31 Or.App. 1249, 572 P.2d 362 (1977). Here, the trial justice did not place the burden upon Correra to prove his diminished capacity. At no point in his charge did the trial justice either expressly place the burden upon Correra or implicitly relieve the prosecution of proving every element of the offense charged beyond a reasonable doubt. We see no reason to fault the charge to the jury.

In its effort to rebut the defense's evidence concerning Correra's alleged hallucinations, the state relied on the testimony of Mary, Correra's live-in girl friend and the deceased's sister. When Mary was asked if she had an opinion regarding whether Correra was actually telling the truth when he reported seeing such animals as "foxes," or "reindeer mice," she replied, "Yes. I didn't really believe that he was seeing them." The trial justice, in overruling Correra's motion to strike this answer, remarked that Mary's live-in experience with Correra qualified her to give an opinion.

Without commenting on Mary's expertise in the area of hallucinations, we have no hesitation in saying that no witness, expert or otherwise, may testify that another witness or the defendant is lying or faking. This is an area within the exclusive province of the jury. *People v. Bost,* 80 Ill.App.3d 933, 36 Ill.Dec. 314, 400 N.E.2d 734 (1980); *Commonwealth v. Ross,* 339 Mass. 428, 159 N.E.2d 330 (1959); *Bailey v. MacDougall,* 251 S.C. 290, 162 S.E.2d 177 (1968); *Smith v. State,* 564 P.2d 1194 (Wyo. 1977). However, we believe that Mary's opinion carried little or no weight with the jury.

Correra's counsel was able to neutralize whatever impact arose from Mary's belief shortly after it had been expressed. In cross-examination, she explained that it was a little hard for her to conceive that anyone could "turn it on and off the way he did in front of people." Shortly thereafter, Mary conceded that she did not know whether Correra was "crazy" or not because she was not a doctor. Furthermore, the medical witnesses' testimony tended greatly to diminish the weight that might have been given to Mary's assessment of Correra.

Earlier, Dr. Franek had told the jury that Correra's hallucinations were real. Even though Dr. Peter differed with Dr. Franek's views as to the presence of herpes simplex encephalitis, he was reluctant to deal with

the hallucination question because he said it was a matter for a psychiatrist. Consequently, we fail to see how Mary's statement prejudiced Correra.

More importantly, substantial evidence existed that Correra had, momentarily at least, premeditated the killing. Specifically, he repeatedly told Mary prior to the shooting that he did not want her brother in the house and that he wanted her to get him out. He had also yelled at the victim to leave the premises and, after the shooting, Correra told Mary, "Go ahead. Go call the cops." In view of the totality of the evidence, we fail to see how Mary's opinion could be said to have persuaded the jury to reach a conclusion other than the one it did.

■ Correra also contends that the trial justice erred when he allowed the state to ask Dr. Franek the effect that drugs would have had on Correra's fantasies. Specifically, Dr. Franek was asked about the part played by Correra's use of codeine and Valium some two or three weeks before the shooting. Correra contends that since ingestion of either of these drugs is a crime, the prosecution was seeking to place prejudicial information before the jury.

Assuming that Correra's drug ingestion was without benefit of prescription and thus criminal, we believe that this testimony was not prejudicial. Before Dr. Franek testified, Mary had told the jury about Correra's experience with drugs. When she was under cross-examination by defense counsel, she stated that Correra had taken Tylenol and pain pills. Subsequently, in redirect examination, she reported that Correra had also taken Valium and cough medicine. No objection was made to this testimony. Hence, it is clear that the information sought from Dr. Franek was substantially the same as that provided earlier by Mary. Correra cannot complain about this evidence because the drug door was first opened by his counsel, and no objection was made to the information elicited by the state. *State v. Pope*, R.I., 414 A.2d 781 (1980); *State v. DeWolfe*, R.I., 402 A.2d 740 (1979).

One of the defense witnesses was Albert Marro. Marro told the jury that Correra claimed to be seeing "reindeer mice." At the time of trial, Marro was an inmate at the Adult Correctional Institutions. When Marro was summoned as a witness, he was brought into the courtroom and escorted to the witness stand. At this time he was in handcuffs. Once Marro took his place on the witness stand, Correra's counsel made the following observation: "May the record reflect that the witness appeared in handcuffs and was hand-cuffed on the witness stand in the presence of the jury."

■ A defendant may not be compelled to stand trial while dressed in prison garb. *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). "[T]he constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.* at 504–05, 96 S.Ct. at 1693, 48 L.Ed.2d at 131. This principle has been extended to incarcerated witnesses who are required to testify while dressed in prison attire. *State v. Yates*, 174 Conn. 16, 19, 381 A.2d 536, 537 (1977).

Likewise, the sight of handcuffs may have a significant effect on a juror's feeling about a defendant. *See Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353, 359 (1970). Handcuffing a witness might influence a juror's judgment of credibility and further hurt the defendant insofar as the witness is to be associated with him. *Commonwealth v. Brown*, 364 Mass. 471, 475, 305 N.E.2d 830, 834 (1973).

■ Understandably, handcuffing must be treated somewhat differently from prison garb because the former provides courtroom security while the latter does not. The trial justice does have a duty, when necessary, to prevent escape, to minimize danger to those attending the trial, and to maintain order in the courtroom as well. *Id.* at 475, 305 N.E.2d at 834. It is proper to handcuff certain prison witnesses whose records demonstrate that they are a threat to courtroom security. Nevertheless, the handcuffing of prison witnesses is to be avoided if possible.

■ Accordingly, it is within the discretion of the trial justice to require that the witness be handcuffed under limited circumstances. The decision is his and not that of the official charged with custody of the prisoner. The reason for restraining a witness should be set forth in the record and the jury reminded that the restraint is not to be considered in assessing the witness's credibility.

We would also hasten to point out that defense counsel who is opposed to the use of handcuffs should object to their use and move for an appropriate order. An objection is necessary because it is not an uncommon defense tactic to produce the defendant or witness in handcuffs with the hope of eliciting sympathy from the jury. *See Estelle v. Williams*, 425 U.S. at 508, 96 S.Ct. at 1695, 48 L.Ed.2d at 133.

■ Here, Correra's counsel failed to object to the handcuffing of Marro. He merely asked that the record reflect the fact that Marro appeared on the witness stand in handcuffs. At no time did trial counsel [2] make clear to the trial justice that Correra was opposed to Marro's manacled courtroom appearance. Consequently, it just cannot be said that Correra was forced to have his witness testify while in handcuffs.

The defendant's appeal is denied and dismissed, and the judgment of conviction appealed from is affirmed.

SHEA, J., did not participate.

### APPENDIX

The following courts are among the overwhelming majority which recognize the defense of diminished capacity in cases where the crime requires proof of a specific intent: *United States v. Zinc [Zink]*, 612 F.2d 511 (10th Cir. 1980); *United States v. Busic*, 592 F.2d 13 (2d Cir. 1978); *Hughes v. Mathews*, 576 F.2d 1250 (7th Cir. 1978); *United States v. Brawner*, 471 F.2d 969 (D.C.Cir.1972); *Hensel v. State*, 604 P.2d 222 (Alaska 1979); *People v. Cruz*, 26 Cal.3d 233, 605 P.2d 830,

162 Cal.Rptr. 1 (1980); *Becksted v. People*, 133 Colo. 72, 292 P.2d 189 (1956); *State v. Donahue*, 141 Conn. 656, 109 A.2d 364 (1954); *State v. Moeller*, 50 Hawaii 110, 433 P.2d 136 (1967); *State v. Gramenz*, 256 Iowa 134, 126 N.W.2d 285 (1964); *State v. Dargatz*, 228 Kan. 322, 614 P.2d 430 (1980); *Starkweather v. State*, 167 Neb. 477, 93 N.W.2d 619 (1958); *State v. Chambers*, 84 N.M. 309, 502 P.2d 999 (1972); *State v. Nichols*, 3 Ohio App.2d 182, 209 N.E.2d 750 (1965); *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976); *State v. Ferrick*, 81 Wash.2d 942, 506 P.2d 860 (1973); *Schimmel v. State*, 84 Wis.2d 287, 267 N.W.2d 271 (1978); *State v. Smith*, 136 Vt. 520, 396 A.2d 126 (1978).

The doctrine of diminished capacity has not been recognized in the following jurisdictions: *State v. Doss*, 116 Ariz. 156, 568 P.2d 1054 (1977); *Bates v. State*, 386 A.2d 1139 (Del.1978); *Bethea v. United States*, 365 A.2d 64 (D.C.App.1976); *State v. Jones*, 359 So.2d 95 (La.1978); *Armstead v. State*, 227 Md. 73, 175 A.2d 24 (1961); *Commonwealth v. Mazza*, 366 Mass. 30, 313 N.E.2d 875 (1974); *Fox v. State*, 73 Nev. 241, [316] 361 P.2d 924 (1957); *State v. Harris*, 290 N.C. 718, 228 S.E.2d 424 (1976); *State v. Flint*, 142 W.Va. 509, 96 S.E.2d 677 (1957).

In several states, the recognition of the diminished-capacity defense has been effected through legislative action: *State v. Burnham*, 406 A.2d 889 (Me.1979); *State v. Anderson*, 515 S.W.2d 534 (Mo.1974); *State v. McKenzie*, Mont., 608 P.2d 428 (1980).

A complete compilation of all cases can be found in 22 A.L.R.3d 1228 (1968).

**2.** Correra's appellate counsel was not his trial counsel.