### STATE

v.

### Joseph M. LaCROIX.

No. 2005–280–C.A.

Supreme Court of Rhode Island.

Dec. 14, 2006.

Diane Daigle, Esq., for Plaintiff.

Marie T. Roebuck, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

After waiving a jury trial, the defendant, Joseph M. LaCroix (defendant), was tried and convicted in Superior Court of breaking and entering a building at night with the intent to commit larceny therein, in violation of G.L.1956 § 11–8–4. The defendant appeals his conviction, alleging that the trial justice violated his fundamental due process rights by requiring that he prove his defense of diminished capacity by means of expert testimony. This case came before the Supreme Court for oral argument on November 1, 2006, pursuant to an order directing the parties to appear and show cause why the issues raised in

this appeal should not summarily be decided. After hearing the arguments and examining the record and the memoranda that the parties filed, we are of the opinion that this appeal may be decided at this time, without further briefing or argument. For the reasons hereinafter set forth, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The defendant was charged by criminal information with breaking and entering with the intent to commit larceny therein in violation of § 11–8–4. The following are the facts, as developed at trial, from which those charges stemmed.

In the early morning hours of September 11, 2003, Jasmyne McKenna, who lived next door to the Cool Corner Creamery (Creamery) in Woonsocket, awoke to a loud banging noise coming from outside her home. She looked out her bedroom window and saw defendant knocking on the Creamery door.[1] Ms. McKenna testified that she watched defendant, illuminated by the business's spotlight, as he pounded on the door and attempted to open it for a minute or so. She immediately called the local police from her bedroom telephone when she witnessed defendant break the glass window next to the establishment's door. While on the phone with the police, Ms. McKenna watched defendant clear away the remaining glass fragments from the broken window and climb through the opening into the Creamery. Approximately one minute later, the police arrived.

Patrolman Michael Cahill (Officer Cahill) of the Woonsocket Police Department testified that he, along with three other police units, was dispatched to the Creamery around 4 a.m. in response to a report of a breaking and entering in progress. He testified that he and the other officers approached the building from all sides and, as he approached the right side of the building, he saw a broken window. Through that window, Officer Cahill said he saw and heard defendant inside the Creamery. Officer Cahill testified that he immediately ordered defendant on the ground at gunpoint to control him as best he could from outside the building. The defendant complied. As Officer Cahill notified the other officers that he had the suspect under control, defendant began to crawl into an alcove behind a machine so that only the lower part of his body remained fully visible. Officer Cahill testified that he could glimpse movement behind the machine.

When the other officers joined Officer Cahill, they quickly assessed the situation and determined that entering the Creamery through the broken window was not a viable option; instead, they decided to have defendant exit the Creamery through the broken window. Officer Cahill testified that he ordered defendant to stand, put his hands on his head, and walk slowly toward the window. The defendant obeyed and the officers helped him through the window. Once outside the Creamery, defendant was handcuffed and searched without incident. They found a "bunch of change in his left pocket," three keys, and a couple of lighters. A screwdriver was also found just outside of the broken window.

Although Officer Cahill testified that defendant appeared to be under the influence

---

1. At trial, defense counsel stipulated that it was defendant who the Woonsocket police found in the Creamery at approximately 4 a.m. on September 11, 2003. Ms. McKenna testified that the man she saw break into the Creamery was the same man who the Woonsocket police found therein.

of alcohol or drugs because he smelled like alcohol, he insisted that defendant "knew what he was doing," never passed out, vomited or lost consciousness while in police custody, did not have a staggering gait, and complied with every order the officers gave him.

At defendant's request, Officer Cahill called an ambulance to treat defendant's bleeding hands. An officer accompanied defendant to the hospital and later transported him to the police station.

After defendant was taken to the hospital, Eleni Michalopoulos, owner of the Creamery, arrived and opened the establishment for the police. She remained at the Creamery while the police searched the premises, gathered evidence, and photographed the scene. Officer Cahill testified that he observed a trail of blood from the broken window to the cash register and from the cash register to the alcove to which defendant had crawled. The officers' investigation also revealed money—two or three one-dollar bills and scattered change—under the machine in the alcove area which, combined with the rest of the seized money, totaled $71.81. Officer Cahill testified that he found a hammer with blood on the handle near the cash register and drops of blood under the cash register. He also found the cash register's inner compartment outside the machine and empty, except for some assorted change.

Ms. Michalopoulos also testified at defendant's trial. She stated that defendant did not have permission to enter the Creamery on September 11, 2003. She also confirmed that there was blood on the Creamery floor and in the back alcove where defendant had crawled. In addition, she testified that the register area had blood on it and that the recovered money was bloody.

The defendant took the stand in his own defense. He testified that the last thing he remembered on September 11, 2003, was waking up at Landmark Medical Center, handcuffed to a bed with a catheter and an IV inserted into his body. He had been treated for cuts on his hands and was told that he was there because he had broken into an ice cream parlor. The medical report from Landmark Medical Center, however, contained no evidence that defendant had a catheter inserted, was handcuffed to the bed, or was ever unconscious.

The defendant also testified that, prior to waking up in the hospital, he remembered being in the hallway of his rooming house and his landlord asking him to leave the property because he could not live there anymore. He testified that he picked up a prescription for Xanax at a Walgreens pharmacy at some point earlier that day and took all thirty pills over the course of the day because they made him feel good. In addition to ingesting approximately thirty Xanax, defendant testified he believed that he drank alcohol earlier that day. He testified that he had visited a local bar on Arnold Street, allegedly frequented by friends who might give him a place to stay. The defendant stated that he remembered leaving the bar, but did not remember anything from that point until he awoke at Landmark Medical Center the next day. He repeatedly acknowledged that he believed everyone who testified that he broke into the Creamery, but maintained that he had absolutely no recollection of actually breaking into the building or being arrested because he had abused his medication and "blacked out totally."

The defendant also testified about his medical and criminal histories. He said that he had taken medication for about twenty years to treat depression, as well as bipolar and paranoia mental disorders. He also said that he experienced blackouts

when he previously went off his medications. The defendant, on cross-examination, acknowledged several prior convictions for breaking and entering and said that he had not blacked out during the commission of those offenses. The defendant also admitted writing an apology letter to the Creamery owner, in which he accepted full responsibility for breaking into the shop and offered to make full restitution for any damage that he caused. The letter contained no mention of defendant's alleged blackout.

Both the state and defendant offered medical records into evidence at the close of trial. These records included defendant's emergency room records from Landmark Medical Center dated September 11, 2003, defendant's prescription records from a Walgreens pharmacy, and defendant's medical records and psychiatric progress notes from the Adult Correctional Institutions, dated September 11, 2003, and September 15, 2003, respectively.

In his closing argument, defendant cited *State v. Correra*, 430 A.2d 1251 (R.I.1981), which he offered as relevant to his diminished-capacity claim as applied to specific-intent crimes, such as larceny. The defendant argued that, based on this case law the state had both failed to (1) prove the essential elements of breaking and entering with the intent to commit larceny therein, and (2) to disprove to any extent the evidence of his diminished capacity. As such, defendant argued that the trial justice should find him not guilty or, alternatively, guilty of the lesser-included offense of trespass.

On July 21, 2004, the trial justice issued a bench decision, finding defendant guilty of breaking and entering with the intent to commit a larceny therein. In his decision, the trial justice stated that he had considered *Correra* as requested, but noted that in this case, unlike *Correra*, there was no

conflicting expert testimony presented on Xanax's alleged effect on defendant at the time of the incident. Further, the trial justice found that defendant's lay opinion that he had blacked out was self-serving. The trial justice also considered the medical records in evidence and found that they failed to establish that defendant suffered a blackout at the time of the incident. The trial justice instead found that the records and evidence offered at trial established inferentially that defendant entered the Creamery with the conscious intent to commit a larceny therein. Therefore, the trial justice ruled that the state had proven beyond a reasonable doubt all elements of the charged offense.

At the trial's conclusion, defendant indicated that he would file a motion for a new trial; however, defendant never did so. On December 10, 2004, the trial justice sentenced defendant to fifteen years incarceration, five to serve, and a judgment of conviction was entered on December 15, 2004. The defendant filed a timely notice of appeal on December 20, 2004. The defendant's sentence was corrected on January 5, 2005, based on a motion defendant filed. He now is serving a sentence of ten years incarceration, five to serve, with five suspended, and a five-year term of probation, all retroactive to defendant's date of arrest.

## II

### Analysis

The defendant argues on appeal that the trial justice erred in requiring that defendant prove the defense of diminished capacity with expert testimony to meet his burden of production, thereby unconstitutionally placing the burden of persuasion on defendant. The state argues that defendant waived his right to raise the aforementioned claims of error because he did

not object at any point during trial to the trial justice's allegedly erroneous application of the law and failed to request that the trial justice place specific findings of fact and law on the record pursuant to Rule 23(c) of the Superior Court Rules of Criminal Procedure and G.L.1956 § 12–17–3. The state also argues that the record is devoid of proof that the trial justice required expert testimony to prove diminished capacity.

Assuming, without deciding, that defendant did not waive the issues presented on appeal, we reject defendant's contention that the trial justice failed to consider his diminished-capacity defense on the ground that defendant did not offer expert testimony and thereby unconstitutionally shifted the burden of persuasion to defendant.

■ When reviewing determinations of credibility and findings of fact by a trial justice sitting without a jury, this Court will not disturb the trial justice's findings unless they are clearly wrong or the trial justice misconceived or overlooked material evidence on a controlling issue. *Bogosian v. Bederman*, 823 A.2d 1117, 1120 (R.I.2003). However, while we afford great deference to the trial justice's findings of fact, we review *de novo* whether constitutional violations occurred in reaching ultimate conclusions drawn from those facts. *See Ferrell v. Wall*, 889 A.2d 177, 183–84 (R.I.2005).

■ "The diminished-capacity doctrine recognizes that although an accused was not suffering from a mental disease or defect when the offense was committed sufficient to exonerate him of all criminal responsibility, his mental capacity may have been diminished by intoxication, trauma, or mental disease so that he did not possess the specific mental state or intent essential to the particular offense charged." *Correra*, 430 A.2d at 1253. When a defendant alleges diminished ca-

pacity, he concedes his responsibility for the act, but claims that he is less culpable due to his mental condition. *Id.* A claim of diminished capacity will negate the specific intent charged only if the intoxication is found to be "of such a degree as to completely paralyze the will of the [defendant], take from him the power to withstand evil impulses and render his mind incapable of forming any sane design." *State v. Edwards*, 810 A.2d 226, 235 (R.I.2002) (quoting *State v. Vanasse*, 42 R.I. 278, 281, 107 A. 85, 86 (1919)). Therefore, if insufficient evidence is presented to negate specific intent, diminished capacity need not be considered. *See State v. Johnson*, 667 A.2d 523, 529 (R.I.1995).

The defendant must present sufficient proof of diminished capacity based on voluntary consumption of alcohol to allow a "rational jury [to find] that [the] defendant was acting with a will so paralyzed and a capacity so diminished by alcohol to have precluded him from forming any sane design or specific intent in carrying out [the specific-intent crime]." *State v. Amazeen*, 526 A.2d 1268, 1272 (R.I.1987). Likewise, proof of diminished capacity based on voluntary drug intoxication must be sufficient to allow a "rational finder of fact [to] find that the defendant had a capacity so diminished by [the drug] as to preclude him from premeditating or forming an intention to [commit the specific-intent crime]." *Edwards*, 810 A.2d at 236.

■ Affording the trial justice's findings in the present case the deference they are due, we cannot say that he was clearly wrong in finding that defendant had not presented evidence that created a reasonable possibility that his capability was so diminished by ingesting Xanax and consuming alcohol that it was questionable whether he could have formed the specific intent to break into the Creamery and

steal money from the cash register. The trial justice discussed his consideration of defendant's diminished capacity argument in his bench decision, but found no evidence supporting defendant's argument, other than defendant's self-serving testimony that he blacked out at the time of the incident after ingesting thirty Xanax and some uncertain amount of alcohol. Because the trial justice was not clearly wrong in discrediting defendant's testimony, and because the trial justice did not misconceive or overlook material evidence in finding an absolute dearth of proof corroborating defendant's version of events, we cannot disagree with the trial justice's ruling.

▮ The defendant also specifically points to the following finding of the trial justice as evidence that he required expert testimony to satisfy the defendant's threshold burden of proof with regard to diminished capacity:

> "[N]o one was offered to establish that [defendant was] having a psychotic episode at that time, the relevant time, and the extent to which the psychotic episode may have affected [his] ability to formulate the requisite intent. The Court sees nothing in the records which have been offered either by the defendant or the State to say or to establish even to a probability that [defendant] had a blackout."

We see no indication that this statement or the trial justice's comment that "no expert opinion has been offered in this particular matter by the defendant" should be read as constituting *requirements* that the defendant present expert testimony. Nothing in the trial justice's decision suggests that expert testimony on the issue of diminished capacity is a requirement *per se*. His comments merely indicate that expert testimony would have assisted him, as trier of fact, in understanding what Xanax is and how Xanax might have affected the defendant at the time of the incident, much like expert testimony assisted the trial justice in determining the effects of Klonopin on the defendant in *Edwards. See Edwards*, 810 A.2d at 235–36. Because the trial justice's statements do not indicate that he *required* that the defendant produce expert testimony to meet his threshold burden to establish diminished capacity, we reject the defendant's argument.

## Conclusion

For the aforementioned reasons, we affirm the judgment rendered below. The record in this case shall be returned to the Superior Court.