STATE

v.

**Leo F. DOYON.**

**No. 78–385–C.A.**

Supreme Court of Rhode Island.

June 26, 1980.

Dennis J. Roberts, II, Atty. Gen., Alfred French Goldstein, Sp. Asst. Atty. Gen., for plaintiff.

Janice M. Weisfeld, Asst. Public Defender, John A. MacFadyen, III, Chief App. Atty., for defendant.

## OPINION

KELLEHER, Justice.

The defendant, Leo F. Doyon (Doyon), was tried before a Superior Court jury on a two-count indictment charging him with arson, a violation of G.L.1956 (1969 Reenactment) § 11–4–1 (1979 Supp.), and murder while in perpetration of arson, a violation of G.L.1956 (1969 Reenactment) § 11–23–1 (1979 Supp.). A Superior Court jury, in its March 6, 1978 verdict, found Doyon guilty of arson and of first-degree murder. He was sentenced to mandatory life imprisonment for murder and to a concurrent twenty-five-year sentence for arson.

Shortly after 2 a. m. on March 26, 1977, the fire engines from the LaSalle Square station roared up Broadway toward the brilliantly red portion of the Providence skyline. Their destination was a blazing apartment building at 715 Westminster Street. At the scene, one of the tenants had attempted to arouse the others by yelling, "Fire!" In response, another tenant, Debra Caplette (Debra), after calling the fire department, climbed out of the window of an apartment she shared with the caretaker of the building, Raymond Mulholland (Ray). She ascended the fire escape to the fourth floor and banged on apartment windows in an effort to alert the tenants. As the building filled with smoke, some of the tenants scrambled onto the fire escapes and descended to the safety of the street; others were assisted or carried by firemen responding to the alarm. One tenant, Robert Souza (Souza), was not so fortunate.

Testimony by Dr. William Q. Sturner, Chief Medical Examiner for the State of Rhode Island, attributed the primary cause of Souza's death to "asphyxia due to smoke inhalation" although laboratory tests also revealed 0.46 gram of ethyl alcohol in Souza's blood. Doctor Sturner concluded that 0.46 gram in and of itself was a potentially lethal alcohol level but found that although the alcohol contributed to Souza's death, it was not the primary cause.

An investigation by the Providence Police Department disclosed that the fire was of incendiary rather than accidental origin. The fire originated at the rear of the Westminster Street building where a flammable liquid had been spread at the second-floor roof level.

Additional testimony by a Providence policeman on desk duty at the central station during the early morning hours of March 26, 1977, showed that Doyon had come to the station twice—the first time to complain that he had been locked out of the apartment where he had been staying and the second time to report that he had set fire to a building at 715 Westminster Street. According to this witness, both times that Doyon visited the police station, he was walking steadily and speaking clearly.

An off-duty Providence policeman also testified that he had seen an agitated Doyon make several phone calls from a gas station located near police headquarters. A few minutes after completing his calls, Doyon left the station carrying a white plastic container filled with gasoline.

On the day preceding the blaze, Doyon worked for an employment agency specializing in part-time help until 4:30 p. m. After receiving a cash advance of $11 for his work, Doyon returned to his temporary residence at 715 Westminster Street. He attempted unsuccessfully to enter Debra and Ray's apartment where he had for the preceding month been allowed to sleep on the living-room couch.

Failing to gain entrance to the apartment, Doyon met another occupant of the building. They then proceeded to visit several bars within walking distance of the Westminster Street building. Doyon's drinking companion testified that they consumed quantities of beer during their spree but did not eat anything and that by the

end of the evening Doyon "was staggering * * * [and] was talking in circles." Doyon and his companion parted company just before midnight. At that time Doyon telephoned the apartment where he had been staying. Ray buzzed the front door and allowed Doyon to enter. After a brief argument, a scuffle ensued and Doyon ran from the building shouting, "You watch your * * * house." Within a few minutes of his departure, Doyon made three threatening phone calls to the apartment. Shortly thereafter the premises at 715 Westminster Street were engulfed in flames.

Extensive trial testimony further revealed the tragic details of Doyon's life—his borderline retardation, the death of his mother when he was about nine years old, and his subsequent placement into the custody of Child Welfare Services by his father. After his placement, Doyon had virtually no contact with either his father or his siblings. His sad journey included stops at a Woonsocket orphanage, the Children's Center, a foster home, Community Workshops, and Talbot House, a facility for the treatment of alcoholics. During a five-month period beginning in April 1976, he was admitted to the Institute for Mental Health five times. Testimony by personnel from these community facilities all attested to Doyon's overwhelming desire to return to the security of a structured family situation.

At trial, Doyon's defense relied heavily upon the facts we have recounted in order to show that he lacked the mental capacity to form the "specific mental states that are essential to the crime of arson." On appeal, Doyon pursues this same argument and asks that, since the Legislature has established a lesser-included offense to the crime charged, the "defense of diminished capaci-

ty should be available to mitigate arson to the crime of statutory burning."[1]

If we adopt Doyon's view, his conviction for first-degree murder cannot stand. At the time of the fire, the unlawful killing of a human being in the perpetration of statutory burning was not specifically enumerated under G.L.1956 (1969 Reenactment) § 11–23–1 as giving rise to murder in the first degree. Section 11–23–1 has been subsequently amended by P.L.1979, ch. 178, § 1, and now provides that a murder committed in violation of § 11–4–2 will be considered first-degree murder.

In addition, Doyon contends that because he was convicted of first-degree murder solely on a felony-murder theory, he was impermissibly convicted and punished twice for the underlying felony. Accordingly, Doyon argues that his constitutional right to be free from double jeopardy as guaranteed by U.S.Const. Amend. V and R.I.Const. art. I, sec. 8, has been violated.

The state, in responding to these contentions, claims that the weight of authority clearly establishes arson as a "general intent crime" to which the defense of diminished capacity is inapplicable and refutes Doyon's double-jeopardy argument by invoking the "concurrent sentence" doctrine. We shall consider the double-jeopardy issue first and then proceed to reflect on the diminished-capacity defense. Relying upon our decision of *In re Leon*, R.I., 410 A.2d 121 (1980), the state contends that we are not compelled to disturb Doyon's arson conviction because "concurrent sentences have been imposed on multiple counts and when a conviction on one count is valid, appellate review of convictions on other counts is unnecessary." *Id.*, 410 A.2d at 126–27.

■ The state's reliance on *In re Leon* is misplaced. In that decision, although we recognized the existence of the *Hirabayashi*

1. General Laws 1956 (1969 Reenactment) § 11–4–2, popularly referred to as statutory burning, comprises the lesser-included offense to arson and provides:

"Any person who wrongfully or maliciously sets fire to * * * any dwelling house * * *, the burning whereof shall not be arson at common law, * * * shall, upon conviction thereof, be sentenced to imprison-

doctrine,[2] we declined to invoke it "because of possible, though not evident, collateral effects" and therefore "considered the points of appeal relating to second degree murder on their merits." *Id.*, 410 A.2d at 127. In the present case, permitting Doyon's arson conviction to stand without addressing the merits of his double-jeopardy argument would ignore completely the potentially adverse collateral consequences of this conviction. A brief quote from *Benton v. Maryland*, 395 U.S. 784, 791, 89 S.Ct. 2056, 2060, 23 L.Ed.2d 707, 714 (1969), should set the issue to rest. The Supreme Court in *Benton* acknowledged the existence of the *Hirabayashi* doctrine but declined to follow it.

"The concurrent sentence rule may have some continuing validity as a rule of judicial convenience. * * * It is sufficient for present purposes to hold that there is no jurisdictional bar to consideration of challenges to multiple convictions, even though concurrent sentences were imposed.

" * * *

"Because of the special circumstances in this case, * * * even if the concurrent sentence doctrine survives as a rule of judicial convenience, we find good reason not to apply it here." *Id.* at 791–92, 89 S.Ct. at 2061, 23 L.Ed.2d at 714.

Applying the *Benton* rationale to the present circumstances, we cannot say unequivocally that "the possibility of collateral consequences is so remote in this case that any double jeopardy violation should be treated as a species of 'harmless error.' " *Id.* at 791, 89 S.Ct. at 2061, 23 L.Ed.2d at 714. We can easily envision circumstances in which Doyon's arson conviction could return to haunt him—either to prevent his release on parole or to impeach his veracity.

■ Accordingly, we now address Doyon's argument that his conviction for first-degree murder based upon felony-murder together with his conviction for the underlying felony, arson, violated the constitutional ban against double jeopardy. With this aspect of Doyon's reasoning we agree.

We recently explained our rule in *State v. Innis*, R.I., 391 A.2d 1158, 1167 (1978) *rev'd on other grounds*, —— U.S. ——, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), consistent with principles enunciated in *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977), and *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d 306, 309 (1932). Our earlier decisions have also consistently followed the *Blockburger* rationale. *State v. Davis*, R.I., 384 A.2d 1061, 1064 (1978); *State v. Grullon*, R.I., 371 A.2d 265, 267–68 (1977); *State v. Boudreau*, 113 R.I. 497, 503, 322 A.2d 626, 629 (1974).

We also note with approval the lucid application of the *Blockburger* test by the Maryland Court of Appeals in *Thomas v. State*, 277 Md. 257, 267, 353 A.2d 240, 246–47 (1976):

"The required evidence is that which is minimally necessary to secure a conviction for each statutory offense. If *each offense requires proof of a fact which the other does not*, or in other words, if *each offense contains an element which the other does not, the offenses are not the same for double jeopardy purposes* even though arising from the same conduct or episode. *But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy purposes.*" (Emphasis added.)

In the present case, elements of the underlying felony, arson, are not statutorily defined in G.L.1956 (1969 Reenactment) § 11–4–1. This section merely sets forth the penalty to be imposed for its violation. In this state, arson is one of six capital offenses punishable by life imprisonment, and its definition is controlled by the common law. *Cf. State v. Domanski*, 57 R.I. 500, 501–02, 190 A. 854, 856 (1937) ("rob-

ment for not less than two (2) years nor more than twenty (20) years."

2. *See Hirabayashi v. United States*, 320 U.S. 81, 85, 63 S.Ct. 1375, 1378, 87 L.Ed.2d 1774, 1778 (1943).

bery" as used but not defined in statutes includes all of its elements at common law). At common law, arson was described as "the malicious and wilful burning" of the dwelling house of another person. 4 Blackstone, *Commentaries* 429 (2d rev. ed. T. Cooley 1873).

Applying the preceding analysis to the present controversy, we find that the state had to prove all the elements of arson as well as all of the elements of murder. The only element distinguishing these two offenses was the proof of Robert Souza's death. *State v. Innis*, R.I., 391 A.2d at 1166. Because only one of the offenses requires proof of a fact that the other does not, the underlying arson-felony necessarily merges with the murder. *Thomas v. State*, 277 Md. at 267, 353 A.2d at 246–47. Accordingly, Doyon's separate though concurrent sentences for the two offenses constitute double punishment for the same offense, thereby violating the double-jeopardy clauses of both the federal and state constitutions.

The diminished-capacity doctrine recognizes that although an accused was not suffering from a mental disease or defect when the offense was committed sufficient to exonerate him totally of all criminal responsibility, his mental capacity may have been so diminished by intoxication, trauma, or mental disease that he did not possess the specific mental state or intent essential to the particular offense charged. *Johnson v. State*, 511 P.2d 118, 124 (Alaska 1973). The availability of a diminished-capacity defense turns upon whether the offense in question requires proof of a specific intent. *United States v. Busic*, 592 F.2d 13, 21 (2d Cir. 1978). Counsel for Doyon asks that we embrace the diminished-capacity doctrine and, in the process, make it applicable to all criminal cases, including those in which the offense charged might be classified as a "general intent" crime.

To set the issue in its proper perspective, we note at the outset that the defense of diminished capacity advocated by Doyon is itself fraught with so much uncertainty that even the description and the definition of the defense are in dispute. Sometimes it is called " 'partial responsibility,' " " 'diminished responsibility,' " " 'diminished capacity,' " " 'partial insanity,' " " 'diminished capacity through diminished responsibility,' " or " 'limited capacity.' " Lewin, *Psychiatric Evidence In Criminal Cases For Purposes Other Than The Defense Of Insanity*, 26 Syracuse L.Rev. 1051, 1052 n. 8, 1054–65 (1975). Professor Lewin acknowledges that the defense "[a]lthough generally applied to first degree murder cases, * * * is in theory applicable to any crime requiring proof of a specific intent * * *." *Id.* at 1055.

Our decisions have consistently recognized the "elementary principle of criminal law that voluntary intoxication does not excuse the commission of an offence." *State v. Vanasse*, 42 R.I. 278, 281, 107 A. 85, 86 (1919). We do recognize, however, that intoxication

"may be offered to negative the specific intent charged, but only when the drunkenness is of such a degree as to completely paralyze the will of the respondent, take from him the power to withstand evil impulses and render his mind incapable of forming any sane design." *Id.* at 281, 107 A. at 86.

We have permitted the defense of voluntary intoxication using the *Vanasse* standard in cases when "[a] *specific intent* is an essential element of a crime * * *." (Emphasis added.) *State v. McGehearty*, R.I., 394 A.2d 1348, 1351 (1978); *Danahey v. State*, R.I., 373 A.2d 489, 491 (1977); *State v. Turley*, 113 R.I. 104, 110–112, 318 A.2d 455, 459 (1974); *State v. Duffy*, 112 R.I. 276, 284–85, 308 A.2d 796, 801 (1973); *State v. Amaral*, 108 R.I. 755, 757, 279 A.2d 428, 429–30 (1971); *State v. Murphy*, 107 R.I. 737, 747–48, 271 A.2d 310, 316 (1970); *State v. Reposa*, 99 R.I. 147, 149, 206 A.2d 213, 214–15 (1965). The distinction between "specific intent" and "general intent" crimes has, however, provided a fertile field for criticism by legal commentators and text writers. *See, e. g.*, LaFave & Scott, *Handbook on Criminal Law* § 28 at 201–02 (1972). Doyon's appeal characterizes this

approach as "formalistic" and urges us to discard these confusing concepts.

To buttress his argument, Doyon quotes extensively from *People v. Hood*, 1 Cal.3d 444, 456–57, 82 Cal.Rptr. 618, 625–26, 462 P.2d 370, 377–78 (1969), a decision by the Supreme Court of California critical of the usefulness of the specific-general-intent dichotomy. The court concluded that it would be "anomalous" to allow evidence of intoxication to afford a defense to crimes such as simple assault or assault with a deadly weapon, crimes that are "so frequently committed" when alcohol has been consumed. *Id.* at 458, 82 Cal.Rptr. at 627, 462 P.2d at 379. Despite its refusal to decide the case based on the specific-general-intent distinction, the court carefully noted that evidence of intoxication as a defense, although inapplicable to cases of assault with a deadly weapon, would still be permitted in "crimes of specific intent." *Id.* at 458, 82 Cal.Rptr. at 627, 462 P.2d at 379. Instead of clarifying California's position regarding the pertinence of intoxication as applied to the requisite mental state of a given crime, *Hood* served little purpose except to engender additional controversy and confusion.

Two years later in *People v. Rocha*, 3 Cal.3d 893, 92 Cal.Rptr. 172, 479 P.2d 372 (1971), the court again grappled with the effect of intoxication as a defense to the crime of assault with a deadly weapon but this time reverted "to those cases that hold that assault with a deadly weapon is a general intent crime."[3] *Id.* at 899, 92 Cal.Rptr. at 176, 479 P.2d at 376. Subsequently, the court noted *Rocha* with approval, observing that "diminished capacity is not a defense to general intent crimes." *People v. Gauze*, 15 Cal.3d 709, 718–19, 125 Cal.Rptr. 773, 778–79, 542 P.2d 1365, 1370 (1975).

■ The weight of authority supports the specific-general-intent distinction and places arson within the general-intent cate-

gory. For instance, the Arizona Court of Appeals found no error in the trial court's refusal to instruct the jury that the crime of arson required proof that the defendant possessed " 'the specific intent to wilfully and maliciously burn * * * .' " *State v. Scott*, 118 Ariz. 383, 385, 576 P.2d 1383, 1385 (Ariz.App.1978). We would agree that the common-law requirement

> "that the defendant act 'wilfully and maliciously' does not mean that the defendant must have an actual subjective purpose * * *. [T]he word 'wilfully' does not add a specific intent element. 'Wilfully' means intentionally as distinguished from accidentally or involuntarily and 'maliciously' means that state of mind which actuates conduct injurious to others without lawful reason, cause or excuse." *Id.* at 385, 576 P.2d at 1385.

Similar sentiments were echoed by the Supreme Judicial Court of Maine in *State v. O'Farrell*, 355 A.2d 396, 398 (Me.1976), and by the Supreme Court of North Carolina in *State v. White*, 291 N.C. 118, 126, 229 S.E.2d 152, 157 (1976). We adhere, therefore, to the common-law mandate that the mental state for the crime of arson requires only that the defendant intended to do the proscribed act, that it was done unlawfully, and that it was not done inadvertently.

In attempting to find persuasive authority that would countenance the invocation of the diminished-capacity theory, we note that some jurisdictions by statute have abolished the distinction between specific- and general-intent crimes and have thereby permitted the diminished-capacity defense to any crime requiring proof of a particular mental state. Generally, these states have adopted the Model Penal Code's hierarchy of culpability encompassing carelessness, recklessness or conscious disregard of the risk, knowledge or awareness, and purpose, Model Penal Code § 2.02(1) (1962), together with its criteria for permitting voluntary intoxication as a defense. *Id.* § 2.08. *See generally*, 2 Wharton, *Criminal Law* §§ 107,

---

**3.** For an interesting analysis of the California specific-general-intent controversy, see Comment, *Rethinking the Specific-General Intent Doctrine in California Criminal Law*, 63 Cal.L.

Rev. 1352 (1975). *See generally* Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage*, 77 Colum.L.Rev. 827 (1977).

108 at 47 and 49 (14th ed. 1979). The American Law Institute Committee explained that when purpose or knowledge is an element of a crime, proof of intoxication may negate the existence of either. Tent. Draft No. 9 at 2–9 (1959).

Even these formulations have not provided viable alternatives to the questions posed by this appeal. For instance, the Supreme Court of Vermont, despite the existence of legislation patterned after the Model Penal Code, still felt impelled to equate the Code's concept of purpose and knowledge to the common-law concept of specific intent. *State v. D'Amico*, 136 Vt. 153, 156, 385 A.2d 1082, 1084 (1978).

In *State v. Stasio*, 78 N.J. 467, 396 A.2d 1129 (1979), the New Jersey Supreme Court criticized the specific-general-intent rationale, rejecting it as "unworkable" and prone to inconsistencies. *Id.* at 474–75, 396 A.2d at 1132. Paradoxically, the court also disavowed what in its view were liberal pronouncements regarding the intoxication defense found in New Jersey's recently enacted Code of Criminal Justice, effective on September 1, 1979, and refused to adhere to its policy. *Id.* at 480–81, 396 A.2d at 1135.

In its criticism of the New Jersey Code of Criminal Justice, the *Stasio* court was fearful that under the new code, since intoxication would negate the mental states of purpose and knowledge, it would "exonerate those * * * guilty of burglaries and criminal trespass. It would be an available defense to arson, * * * robbery, and theft. It could * * * excuse shoplifting * * *." *Id.* at 482, 396 A.2d at 1136.

To justify its position, the *Stasio* court observed that the Arkansas Legislature in 1977 repealed its self-induced intoxication defense based upon the Model Penal Code. *Id.* at 481, 396 A.2d at 1135. Section 41–207 of the Arkansas Statutes Annotated had for two years permitted "[s]elf-induced intoxication" as "an affirmative defense to a prosecution if it negates the existence of a purposeful or knowing mental state." The repealing legislation characterized the situation as an "emergency" because the defense of voluntary intoxication had been "detrimental to the welfare and safety of the citizens of this State * * *." 1977 Ark.Acts No. 101, § 3. When the Legislature abrogated the statutory defense of self-induced intoxication, the common law embodying the specific-general-intent dichotomy was implicitly revived. *Varnedare v. State*, 264 Ark. 596, 573 S.W.2d 57 (1978).

California, in *Hood*, attempted to avoid the specific-general-intent distinction but found that the lower courts were still relying upon that rationale. *People v. Rocha*, 3 Cal.3d at 897, 92 Cal.Rptr. at 175, 479 P.2d at 375; Comment, *Rethinking the Specific-General Intent Doctrine in California Criminal Law*, 63 Cal.L.Rev. at 1360–61. We find it noteworthy that the Supreme Court of California in *Rocha*, in order to extricate itself from the jurisdictional straitjacket self-imposed by *Hood*, has reverted to the specific-general-intent rationale as the basis for deciding the applicability of voluntary intoxication as a defense.

Earlier, we noted the distinction between the defense of a mental disease or defect, which absolves the defendant from all criminal responsibility for any type of crime, and the doctrine of diminished capacity, which serves only to negate the specific mental element or intent necessary to charge an offense. Recently, in *State v. Johnson*, R.I., 399 A.2d 469, 476 (1979), we adopted a standard for determining criminal responsibility whereby a person could not be held responsible for his criminal actions if at the time of those actions as a result of a mental disease or defect, his capacity either " 'to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible.' " We also stressed that the term "mental disease or defect" did not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct. *Id.*, 399 A.2d at 476.

While those who espouse unrestricted use of the diminished-capacity doctrine claim its use will reduce the degree of crime rather than excuse its commission, we are concerned that such use would make the doc-

trine almost indistinguishable from the defense of mental disease or defect. Acceptance of the doctrine requires that there must be some lesser-included offense which lacks the requisite specific intent of the greater offense charged. Otherwise, as the Delaware Supreme Court says, the doctrine becomes an impermissible substitute for determining criminal responsibility. *McCarthy v. State*, 372 A.2d 180, 183 (Del.Sup. 1977). Accordingly, we hold that the trial justice did not err when he refused to give the instructions sought by Doyon.

The defendant's appeal is sustained in part and denied in part, the judgment appealed from is affirmed in part and vacated in part, and the case is remanded to the Superior Court with direction to dismiss count 2 of the indictment.

DORIS, J., did not participate.