Jeffrey S. WASHINGTON

v.

STATE of Rhode Island.

Jeffrey S. Washington

v.

State of Rhode Island.

Nos. 2007–66–Appeal, 2008–255–Appeal.

Supreme Court of Rhode Island.

Feb. 25, 2010.

Aaron Weisman, Esq., Providence, Department of Attorney General, for Plaintiff.

Mark B. Laroche, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

The applicant, Jeffery S. Washington, appeals from a Superior Court judgment denying his applications for postconviction relief. His original conviction dates to May 1989, when a jury found him guilty of first-degree felony murder for the rape and resulting death of an elderly woman. This case came before the Supreme Court for oral argument on January 26, 2010, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the parties' arguments and considering the memoranda submitted on behalf of each of them, we are satisfied that cause has not been shown, and we proceed to decide this appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

This sad story begins on Christmas Day 1987, when Alice Carcieri, an elderly double amputee, died from the trauma precipitated by a brutal sexual assault.[1] On that day, the applicant, who had worked cleaning Ms. Carcieri's house in the past, snuck into the basement of her house, where he consumed drugs, ate some food, and relieved himself in a bucket. After entertaining friends and family for the holiday, Ms. Carcieri went to bed. Washington proceeded upstairs to her bedroom and found her asleep. After covering her head and tying her hands to the bedposts, he raped her. Washington attempted to make it appear as though a burglary had occurred before he fled. He left Ms. Carcieri in her bed, where she died from heart failure. A horrified family member discovered her there the next morning.

The applicant was apprehended and arrested in New York after he attempted to steal a wallet. He implicated himself in the death of Ms. Carcieri, and the New York authorities alerted the Providence police. Officers from that department traveled to New York, where they obtained a full confession from him, in which he expressed his remorse for his treatment of Ms. Carcieri. Washington was charged with murder, and eventually he was tried before a jury in the spring of 1989.[2] The jury returned a verdict of guilty on the charge of first-degree felony murder, and the panel also concluded that the murder involved aggravated battery. The trial justice upheld the jury's finding of aggra-

---

1. The facts of this case are set forth in detail in this Court's opinion of *State v. Washington*, 581 A.2d 1031 (R.I.1990) in which we denied applicant's direct appeal.

2. At trial, the applicant was represented by the chief public defender of Rhode Island, who is now deceased.

vated battery and in addition found that there had been aggravated torture. He sentenced Washington to life in prison without the possibility of parole. The applicant appealed his conviction to this Court; however, we affirmed the judgment of conviction. *State v. Washington,* 581 A.2d 1031, 1036 (R.I.1990).

On April 2, 1998, Washington began his quest for postconviction relief by filing an incomplete *pro se* application. Since that time, he has been represented by various appointed counsel, but it was not until January 27, 2004, that applicant submitted a complete application for postconviction relief, which was heard before a hearing justice of the Superior Court on June 28, 2004. A decision denying the application was issued on July 18, 2005.[3]

Washington filed a second application for postconviction relief on August 1, 2005, citing documents that he had received from the Federal Bureau of Investigation (FBI). Hearings on that petition were held before the same hearing justice and he met with the same fate; his second application for postconviction relief was denied. He then filed a premature appeal to this Court. The applicant's two appeals from the decisions denying his two applications for postconviction relief were consolidated on November 20, 2008.

## II

### Standard of Review

■ "[P]ost-conviction relief is available to a defendant convicted of a crime who contends that his original conviction or sentence violated rights that the state or federal constitutions secured to him." *Ballard v. State,* 983 A.2d 264, 266 (R.I. 2009) (quoting *Young v. State,* 877 A.2d 625, 628 (R.I.2005)); *see also* G.L.1956 § 10–9.1–1(a)(1) (providing statutory right to postconviction relief for constitutional violations). "When this Court reviews a ruling on an application for postconviction relief, we afford great deference to the motion justice's findings of fact." *Moniz v. State,* 933 A.2d 691, 694 (R.I.2007) (citing *Burke v. State,* 925 A.2d 890, 892 (R.I. 2007)). "[A]bsent clear error or a determination that the motion justice neglected or misconceived the evidence, this Court will uphold a postconviction relief decision." *Id.* (citing *Reise v. State,* 913 A.2d 1052, 1055 (R.I.2007)). However, "[t]his Court will * * * 'review *de novo* any post-conviction relief decision involving questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights.'" *Bustamante v. Wall,* 866 A.2d 516, 522 (R.I.2005) (quoting *Taylor v. Wall,* 821 A.2d 685, 688 (R.I.2003)).

## III

### Analysis

■ On appeal before this Court, applicant raises four issues.[4] First, he argues that his trial attorney provided him with

---

**3.** The applicant filed a premature appeal to this Court on July 26, 2005 before final judgment was entered. Although final judgment was not entered until September 3, 2008, we will treat the premature appeal as if it were timely filed. *See Bleau v. State,* 968 A.2d 276, 278 n. 1 (R.I.2009) (citing *Brown v. State,* 964 A.2d 516, 526 n. 14 (R.I.2009)).

**4.** The applicant also argued at his postconviction-relief hearing and before this Court that the state violated discovery rules by failing to disclose evidence that might demonstrate applicant's diminished capacity, such as the analytical results from the contents of the bucket that applicant left in the victim's basement around the time that he committed the crime. He further contended at a postconviction-relief hearing on his second application, as he does here, that approximately fifty pages of laboratory documentation were withheld from him during his trial. He alleges that that was the fault of either the FBI or the

ineffective assistance of counsel because he failed to present a defense of diminished capacity at trial. Second, Washington contends that his trial attorney provided ineffective assistance of counsel because of his "broken promise to the jury" that defendant would testify in his own defense. Third, he raises still another argument of ineffective assistance of counsel in which he asserts that his trial attorney refused to allow him to testify in his own defense. Finally, he argues that the trial justice committed reversible error when he did not conduct a hearing and colloquy with him to determine that applicant's waiver of his right to testify was done knowingly, intelligently, and voluntarily.

## A

### Ineffective Assistance of Counsel

 "This Court has adopted the standard announced by the United States Supreme Court in *Strickland v. Washington*, [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 * * * (1984)] when generally reviewing claims of ineffective assistance of counsel." *Rodrigues v. State*, 985 A.2d 311, 315 (R.I.2009) (quoting *Powers v. State*, 734 A.2d 508, 521–22 (R.I.1999)). The *Strickland* standard requires this Court to review allegations of ineffective assistance of counsel by using a two-part test. *Moniz*, 933 A.2d at 696 (citing *Burke v. State*, 925 A.2d 890, 893 (R.I.2007)).

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

Under the performance prong of the test, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Under the prejudice prong, the defendant must demonstrate that counsel's objectively unreasonable performance caused a "reasonable probability that * * * the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. The Court in *Strickland* cautioned, however, that "scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. 2052. Therefore, this Court "will reject an allegation of ineffective assistance of counsel 'unless a

Rhode Island Attorney General. He also seeks to determine whether additional documentation exists. The hearing justice issued an order that denied those claims for postconviction relief "consistent with the court's earlier 62–page written decision." In her decision, the hearing justice ruled that the court could not decide the issue about these alleged discovery violations in accordance with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) because defendant failed to provide "any such evidence allegedly withheld by the State at trial." "This Court affords great deference to a trial justice's decision

with respect to whether or not a violation of * * * *Brady v. Maryland* * * * has occurred, and it 'will not disturb that ruling unless he or she has committed clear error.' " *State v. Diefenderfer*, 970 A.2d 12, 23 (R.I.2009) (quoting *State v. McManus*, 941 A.2d 222, 229 (R.I.2008)). In our view, the record supports the trial justice's ruling that Washington did not prove a *Brady* violation and, therefore, her decision was not clear error. Moreover, applicant repeatedly has conceded that the proper forum for these claims is in the federal court. He indicates that he will pursue those claims in that forum.

defendant can demonstrate that counsel's advice was not within the range of competence demanded of attorneys in criminal cases' * * *." *Rodrigues,* 985 A.2d at 315 (quoting *Moniz,* 933 A.2d at 697 and *Miguel v. State,* 774 A.2d 19, 22 (R.I.2001)).

## 1

### Diminished Capacity Defense

■■■ In his application for postconviction relief, applicant argued that his attorney furnished ineffective assistance when he failed to present a diminished-capacity defense at trial. He asserts that his attorney did not present evidence of his "inability to form a malicious intent, i.e. his diminished capacity." Specifically, applicant contended in his application that his attorney neglected to introduce exculpatory evidence about his state of mind on the night of the crime. He urges that his counsel erred when he did not "pursue expert testimony and lab reports and the analysis of bucket contents that would have established that the defendant was under extreme emotional duress, or a drug induced hallucination, at the time of the incident and had very little capacity to conform his conduct to the law." Moreover, he asserted that his attorney did not challenge the prosecution's evidence, nor did he present testimony about his propensity to "blackout" when under the influence of drugs and alcohol.

The hearing justice rejected this argument. She found "that it was objectively reasonable for Mr. Washington's defense counsel to [forgo] a defense of diminished capacity at trial given its uselessness in defending against charges of felony murder based on rape and the lesser included charge of rape." The hearing justice explained that such a defense could not benefit defendant because felony murder is a general-intent crime that does not require the prosecution to prove that defendant had the specific intent to commit murder and, therefore, diminished capacity is not available as a defense.

There was a substantial amount of physical evidence tying Washington to this crime including hair and fingerprint evidence. Additionally, the jury was presented with Washington's confession and other correspondence between him and Ms. Carcieri's family, in which he expressed his remorse. Further, there was a dearth of evidence in the record that the FBI had preserved or tested the contents of the bucket. Therefore, the hearing justice found that Washington's attorney's decision not to present a diminished-capacity defense was an objectively reasonable tactical decision, and also "wise." She did not afford any weight to applicant's testimony at the postconviction relief hearing that he was prone to blackouts and that he suffered from one the night of the crime. Thus, the hearing justice concluded that Washington failed to satisfy the initial performance prong of the *Strickland* test with regard to his allegations that his attorney provided ineffective assistance.

■■■ In our view, Washington was provided with effective representation. It was objectively reasonable for counsel to decline to present a defense that would be unavailing with regard to the crime charged. This alone eviscerates applicant's argument that his trial attorney's performance was deficient under the first *Strickland* prong. The applicant was charged under G.L.1956 § 11–23–1 with the general-intent crime of felony murder.[5]

---

5. General Laws 1965 § 11–23–1 provides that "[e]very murder * * * committed in the perpetration of, or attempt to perpetrate, any

* * * rape, any degree of sexual assault * * * is murder in the first degree." Additionally, the crime of rape "has always been consid-

"General-intent crimes require only the 'intention to make the bodily movement which constitutes the act which the crime requires,' * * * whereas specific intent crimes most commonly involve the designation of 'a specific mental element * * *.'" *State v. Sivo*, 925 A.2d 901, 914 (R.I.2007) (quoting 1 LaFave, *Substantive Criminal Law* § 5.2(e) at 354, 355 (2d ed.2003)). The crime of felony murder does not require "proof of the specific intent to kill or to cause great bodily harm." *State v. Amazeen*, 526 A.2d 1268, 1271 (R.I.1987). Under a diminished-capacity defense, a defendant submits that, although he is responsible for the prohibited act, "his mental capacity may have been diminished by intoxication, trauma, or mental disease so that he did not possess the specific mental state or intent essential to the particular offense charged." *State v. LaCroix*, 911 A.2d 674, 679 (R.I.2006) (quoting *State v. Correra*, 430 A.2d 1251, 1253 (R.I.1981)). Accordingly, the defense is available only for crimes of specific intent. *See id.; State v. Doyon*, 416 A.2d 130, 134 (R.I.1980) ("The availability of a diminished-capacity defense turns upon whether the offense in question requires proof of a specific intent.") (citing *United States v. Busic*, 592 F.2d 13, 21 (2d Cir. 1978)).

Thus, Washington's attorney's decision not to present evidence that might establish that he suffered from a diminished capacity that prevented him from forming the specific intent to kill was sound.

### 2

#### Promise to the Jury

█ The applicant next argues that his counsel was constitutionally deficient because he promised the jury during his

opening statement that Washington would testify in his own defense, but because applicant ultimately waived his right to testify, the promise to the jury was left unfulfilled. This, he argues, prejudiced him to such an extent that a new trial is warranted. He contends that his attorney's breach of this promise was objectively unreasonable and resulted in the violation of his constitutional right to testify. During his opening statement, Washington's attorney informed the jury that Washington would "take the stand and he is going to tell you how he feels sorry for what he did" and also would relate what his state of mind was throughout the events leading up to and following the commission of the crime. After applicant decided not to testify, his attorney explained the apparent inconsistency to the jury during his closing statement. He said, "During my opening statement, I suggested to you that Jeffrey Washington would testify and tell you his state of mind, and you are probably wondering why he did not * * * he didn't take the stand because he has already testified in this case * * *." He then reminded the jury about Washington's confession and letters to the victim's family, which told his side of the story and indicated his remorse.

The hearing justice rejected Washington's argument that his attorney provided ineffective assistance of counsel as a result of his broken promise to the jury. She concluded that his attorney's performance was not objectively unreasonable in that he did not actually break a promise to the jury. That was so, she reasoned, because applicant's remorse and state of mind were presented to the jury through other means that did not expose applicant to a cross-

---

ered a general-intent crime and has never been interpreted by this Court as requiring a *mens rea*." *State v. Yanez*, 716 A.2d 759, 768

(R.I.1998) (citing *State v. Bryant*, 670 A.2d 776, 783 (R.I.1996)).

examination that most likely would have been damaging to the defense. She also concluded that Washington had not established the second *Strickland* prong because "he has failed to demonstrate that his testimony likely would have made a difference in the outcome of his trial."

In reaching her decision on this issue, the hearing justice distinguished this case from *Ouber v. Guarino*, 293 F.3d 19 (1st Cir.2002). In *Ouber*, the petitioner went to trial three times on a drug-trafficking charge. *Id.* at 22. The first two trials, in which she testified in her own defense, resulted in deadlocked juries. *Id.* At the beginning of the third trial, her attorney made an opening statement in which he promised the jury four times that the petitioner would take the stand; throughout his opening, he stressed the importance of her testimony. *Id.* At the third trial, however, unlike the previous two trials, the petitioner was not called as a witness, despite her attorney's quadrupled pledge in his opening statement that she would take the stand. *Id.* at 23. The jury found the petitioner guilty. *Id.*

The *Ouber* court, in accordance with the *Strickland* standard, analyzed "the attorney's initial decision to present the petitioner's testimony as the centerpiece of the defense (and his serial announcement of that fact to the jury in his opening statement)" and juxtaposed it with his ultimate decision to advise the petitioner that she should not testify. *Ouber*, 293 F.3d at 27. As for the first prong, the court held "that the attorney's performance was constitutionally deficient under *Strickland*—and severely so." *Id.* at 32. The court reasoned that the performance was deficient because the attorney made an unjustified mid-trial decision to forgo presenting the petitioner as a witness and that there were no unforeseeable events that precipitated his "change of heart." *Id.* at 29. Indeed, the same attorney had represented the petitioner in the previous two trials for the same offense. *Id.*

The court in that case also held that "but for" the attorney's "egregious" error of repeatedly promising the petitioner's testimony, which he himself characterized as important, and then failing to call the petitioner as a witness, "a different outcome might well have eventuated." *Ouber*, 293 F.3d at 34. The court reasoned that "the only salient difference" between the first two trials and the third was the fact that the petitioner did not testify in the third trial, as she had in the first two. *Id.* at 35. The court characterized this contrast as a "prime example" of how the third trial "likely would have ended" had the petitioner taken the stand in fulfillment of her attorney's assurances to the jury. *Id.*

Here, the hearing justice differentiated the broken promise of the petitioner's testimony in *Ouber* from Washington's attorney's unfulfilled assurance of Washington's testimony on several grounds. Unlike *Ouber*, where the purpose of the petitioner's testimony was to allow the jury to assess the "truth and veracity" and credibility of the petitioner in contrast to another witness, the stated purpose of Washington's testimony was to inform the jurors of his remorse and state of mind. *Ouber*, 293 F.3d at 22. The hearing justice found that "[t]he testimony elicited by defense counsel, the evidence admitted at trial and counsel's arguments * * * establish[ed] the defendant's remorse and state of mind, as was promised to the jury." Therefore, she found that the promise to the jury was not actually broken, but rather that its purpose was accomplished by other means.

Moreover, the hearing justice also distinguished the applicant's attorney's promise from that of the attorney in *Ouber* in that the attorney in *Ouber* changed his

mind during the course of the trial, while applicant's attorney did not. *Ouber*, 293 F.3d at 23. She found that applicant's attorney "never wavered in his decision to advise Mr. Washington not to take the stand but, contrary to counsel's advice, the defendant insisted on testifying in order to fulfill his promise to the family to tell them the truth about what had happened to Alice Carcieri." Additionally, the attorney in *Ouber* reneged in the face of his personal experience in the two previous trials. *Id.* at 29. But here, the hearing justice found that "the evidence does not suggest that counsel could reasonably have expected or counted on a change of heart by the defendant about taking the stand." Therefore, she ruled that neither prong of the *Strickland* test had been satisfied because the pledge to the jury was fulfilled (albeit not in the manner anticipated), applicant's decision not to testify was unforeseeable at the outset of the trial, and, importantly, applicant "failed to demonstrate that his testimony likely would have made a difference in the outcome of his trial."

We agree with the hearing justice's analysis and, in our opinion, applicant received the benefit of effective representation. Although *Ouber* and the facts of this case seem similar at first blush, upon closer examination, the *Ouber* case is readily distinguishable. The attorney in *Ouber* made repeated promises to the jury and stressed the importance of the jury's hearing the petitioner's testimony so that the jurors could assess her credibility in comparison to that of the other witnesses. *Ouber*, 293 F.3d at 22. When this testimony did not materialize, a large portion of the defense's case was thus missing. Here, in contrast, and as the hearing justice found, the information to be gained from applicant's promised testimony was furnished through other means, including applicant's remorseful confession, testimony from other witnesses

about applicant's remorse, and his letters to the victim's family detailing the events surrounding the crime, which reiterated his contrition.

■ Further, unlike the attorney in *Ouber*, applicant's attorney did not make repeated and emphatic promises, and also did not experience a belated epiphany that defendant should not take the stand. In stark contrast, Washington's attorney persisted in advising him to forgo taking the stand because he believed it was not in his client's best interest to do so. Moreover, the record cannot support a conclusion that Washington's testimony would have had a reasonably probable effect on the outcome. Indeed, Washington himself said at the hearing for postconviction relief that his testimony at trial would have been given for the benefit of Ms. Carcieri's family and would have included his request for the death penalty.

After careful review of the record, we cannot say that the hearing justice neglected or misconceived the evidence. Therefore, it is our opinion that applicant failed to " 'demonstrate that counsel's advice was not within the range of competence demanded of attorneys in criminal cases' * * *." *Rodrigues*, 985 A.2d at 315 (quoting *Moniz*, 933 A.2d at 697). Accordingly, his claim of ineffective assistance of counsel on the ground that his attorney broke his promise to the jury must fail.

### 3

### Alleged Refusal to Allow Applicant to Testify

■ The applicant argues that his counsel also was constitutionally remiss because applicant's "will and desire to testify was overborne" by his counsel. He argues that the hearing justice's findings of fact regarding Washington's attorney's advice to him that he not testify in his

defense "could reasonably be used to meet" the first part of the *Strickland* test, and, therefore, he claims that the hearing justice's conclusion that he received effective assistance of counsel when he waived his right to testify at trial "was error or an abuse of discretion." With respect to the second prong of the *Strickland* test, applicant contends that "his testimony was essential to the [j]ury's understanding of his state of mind and his remorse, * * * which only he could present."

The hearing justice rejected applicant's argument that his waiver of his right to testify was the product of his attorney's ineffectiveness. In dispatching his argument, she found the applicant's attorney "vigorously" and "zealously" represented applicant when he counseled him against taking the stand, advice which the hearing justice found that applicant accepted "voluntarily, intelligently, and knowingly." After reviewing of the record and hearing testimony, the hearing justice found "no credible evidence" to support the argument that applicant's "will to testify was overborne by counsel." She also concluded that applicant had "fail[ed] to present evidence that the absence of his testimony prejudiced him at trial." She found that if applicant had testified, he would not have offered beneficial testimony for his defense and his testimony would not have "produced a different outcome of the proceeding." Therefore, the hearing justice concluded that Washington had failed to establish that he could overcome either prong of the *Strickland* test.

We agree with the hearing justice and are of the opinion that Washington has not shown that he received ineffective assistance of counsel when he took his attorney's advice and waived his right to testify at trial. Washington argues that the facts here "are similar" to those in *United States v. Teague*, 953 F.2d 1525, 1534 (11th Cir.1992), which held that, under the first prong of the *Strickland* standard, the "essence" of such a claim "is that the action or inaction of the attorney deprived the defendant of the ability to choose whether or not to testify in his own behalf." After careful review of the record, we disagree with applicant and, like the hearing justice, hold that, as in *Teague*, 953 F.2d at 1535, the record here "reflects a voluntary waiver by the defendant of his right to testify."

In *Teague*, 953 F.2d at 1527, the defendant informed his attorney before trial that he wished to testify. His attorney determined that the defendant might encounter difficulty on the witness stand, but decided to "wait and see" whether it would be beneficial for the defendant to testify. *Id.* at 1528. After a witness gave conflicting testimony, the defendant pulled on his lawyer's sleeve and inquired about when he could testify himself. *Id.* However, his attorney told him not to be concerned about the testimony, and the defense rested without the defendant's testimony. *Id.* Prior to closing arguments, the defendant asked again when he would have the opportunity to testify. *Id.* His attorney told him that his testimony was not necessary. *Id.* Even after receiving a verdict, the defendant called his attorney at home and asked her when he could give his version of the events. *Id.*

The *Teague* court analyzed the allegations of ineffective assistance of counsel under *Strickland's* two-part test. *Teague*, 953 F.2d at 1534. It held that "counsel's performance was not constitutionally deficient" and thus the defendant had not satisfied the first prong of the test. *Id.* at 1535. The court reasoned that an attorney's performance is not objectively reasonable if the attorney either refuses to accept the defendant's decision to testify or if the attorney does not inform the defendant of the right to testify. *Id.* at

1534. Viewing the argument from the perspective of defense counsel, the court concluded that the defendant's attorney "believed that Teague had assented or acceded to her recommendation" that he refrain from taking the witness stand. *Id.* at 1535. Therefore, counsel had neither refused to accept her client's decision to testify nor failed to inform him of his right to do so. *Id.*

In the case before us, the record reveals that applicant's attorney, like the attorney in *Teague,* did not refuse to accept his client's desire to testify, nor did he fail to inform applicant of his right to testify. Indeed, as the hearing justice acknowledged, applicant's attorney addressed applicant's desire to testify in his opening statement to the jury. Accordingly, the hearing justice discredited applicant's testimony that his attorney "always told him that he would not be allowed to take the stand, no matter what." She noted that his attorney had requested a recess and conferred with Washington for thirty minutes before resting his case. Further, when applicant's attorney informed the trial court of the defense's decision to rest without presenting applicant as a witness, the attorney asked him on the record, "Is that correct, Jeffrey?" to which Washington replied, "Yes." She concluded that "[i]t reasonably can be inferred * * * that defense counsel advised Mr. Washington during the conversation against testifying in response to the State's case at trial and that Mr. Washington assented voluntarily" during the thirty-minute recess.

Based on this evidence, and aware that applicant did not accuse his attorney of violating his right to testify until a year after his attorney's death, the hearing justice found that applicant's waiver of his right to testify was knowing and intelligent. Therefore, she ruled that applicant had not shown that his counsel's actions in vigorously advising applicant to not testify were objectively unreasonable. After a review of the record, we cannot say that the hearing justice neglected or misconceived the evidence when she made findings on the performance of applicant's attorney. Therefore, we are of the opinion that the hearing justice did not err when she concluded that applicant voluntarily waived his right to testify, and that he received effective assistance of counsel. Because we are satisfied that applicant did not establish the first prong of the *Strickland* test on this issue, we need not discuss whether his defense was prejudiced by the absence of his live testimony before the jury, such that the outcome of the trial would have differed.

**B**

**Waiver of Right to Testify**

 Finally, applicant argues that the trial justice was required to conduct a hearing and a personal colloquy with him to ensure that his waiver of his right to testify was knowing, intelligent, and voluntary. He asserts that the trial justice's failure to do so amounts to reversible error. As the hearing justice acknowledged, this part of applicant's postconviction-relief application was likely reviewable in his 1989 direct appeal to this Court, but the issue was not raised at that time. Although such issues may be deemed waived, we may consider them if they implicate constitutional considerations. *See State v. Carvalho,* 450 A.2d 1102, 1104, 1105 (R.I. 1982) (holding that under limited circumstances, an applicant "may seek postconviction review of alleged errors of basic constitutional proportions even though such issues were available for direct review," such as when "novel constitutional issues that could not have been appreciated by counsel at the time the direct appeal was brought" are involved).

*Brennan v. Vose,* 764 A.2d 168, 171–72 (R.I.2001), clearly dispatches any tenable argument that the trial justice erred when he accepted the applicant's waiver of his right to testify without conducting a colloquy with him to verify that his waiver was knowing, voluntary, and intelligent. In *Brennan,* this Court declined "to adopt a rule providing for a *sua sponte* inquiry by the trial justice to insure that an applicant has made a knowing and voluntary waiver of his right to testify." *Id.* at 171. Consequently, the hearing justice concluded that the trial justice did not err when he did not conduct "a *sua sponte* inquiry with the defendant regarding his waiver of his right to testify." We concur with the hearing justice that, in accordance with *Brennan,* the trial justice was not required to conduct such a colloquy and his failure to do so does not constitute reversible error.

## IV

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.